Keith MOBERG and Joy Robb,
Appellants,

v.

INDEPENDENT SCHOOL DISTRICT NO. 281, School Board of Independent School District No. 281, individually and in their representative capacity,

and

Ann Rest, individually and as a representative of Citizens Concerned for District No. 281, Respondents.

No. C6–82–1108.

Supreme Court of Minnesota.

July 15, 1983.

Stern, Levine, Schwartz, Lifson, Creighton & Bunin, Thomas D. Creighton and Brian F. Corey, St. Louis Park, for appellants.

Levander, Zimpfer, Zotaley & Vander Linden, Bernard Zimpfer and Robert H. Rydland, Minneapolis, for Independent School Dist. 281, et al.

Popham, Haik, Schnobrich, Kaufman & Doty and Bruce D. Willis, Minneapolis, for Ann Rest.

Peterson, Popovich, Knutson & Flynn, Peter S. Popovich and Susan Schoell, St. Paul, for Minnesota School Boards Ass'n.

Linda E. Museus of Louis D. Bass Law Office, Minneapolis, for Minnesota Common Causes.

Robert J. Alfton, City Atty., and Shannon E. Bradbury, Asst. City Atty., Minneapolis, for City of Minneapolis League of Minnesota Cities.

Holman & Holman, Kingsley D. Holman and David L. Holman, Bloomington, for Independent School Dist. No. 271.

Mark F. Anfinson, Minneapolis, for Minnesota Newspaper Ass'n.

Stanley G. Peskar and Jean Mitchell, St. Paul, for League of Minnesota Cities.

Oppenheimer, Wolff, Foster, Shepard & Donnelly, Mark S. Olson and Laurie A. Zenner, St. Paul, for Minnesota Educ. Ass'n.

LeFevere, Lefler, Kennedy, O'Brien & Drawz, J. Dennis O'Brien, Brian F. Rice and Lorraine S. Clugg, Minneapolis, for Ass'n of Metropolitan School Districts.

AMDAHL, Chief Justice.

Appellants brought an action for declaratory judgment requesting that respondents be enjoined from closing Robbinsdale High School, that respondent school board members be found in violation of Minn.Stat. § 471.705, subd. 1 (1982) (the Open Meeting Law), and that statutory penalties of fines and removal from office be imposed as consequences of those alleged violations. As a remedy for alleged violations of both the Open Meeting Law and the notice and hearing requirements of Minn.Stat. § 123.36, subd. 11 (1982) (the Schoolhouse Closing Statute), appellants also requested that the closing of Robbinsdale Senior High School be invalidated.

Appellants Keith Moberg and Joy Robb are homeowners and taxpayers residing within Independent School District No. 281. Respondent Independent School District No. 281 is located entirely within Hennepin County, and encompasses all of the communities of Robbinsdale, Crystal and New Hope, and part of the communities of Golden Valley, Plymouth, Brooklyn Park and Brooklyn Center. Respondents Webber, Olson, Marofsky, Bergquist, Joselyn and Fuhrmann are all residents of Independent School District No. 281, and at all times relevant to this lawsuit were members of the School Board of Independent School District No. 281 (Board).

The school district suffered a decline in its enrollment from 28,300 students in the 1971–72 school year to 16,300 in the 1981–82 school year. The enrollment decline reduced revenue from state sources, causing the closure of seven elementary schools and one junior high school. Initiation of the process to close a high school prior to the 1982–83 school year began in 1979, when the Board appointed a grade reorganization committee, comprised of citizens and staff members, to study six grade organization plans. On February 2, 1981, after studying the six plans and hearing the committee's report, the Board decided to keep the existing grade organization plan, which limited high school enrollment to tenth, eleventh and twelfth grades. The projected enrollment for those grades was insufficient to support three schools. In order to save the school district an additional $1,000,000 for the 1982–83 school year, the Board decided it must close a high school.

On July 6, 1981, the Board established a timetable for the high school closing which called for the school administration to submit its recommendation to the Board on the

school closing on or before October 12, 1981. A formal proposal to close one school was to take place on October 19, 1981, with final action to be taken on November 16, 1981.

In July and August, three hearings were held at which representatives of each high school made a presentation to the Board regarding their respective schools.

On October 12, 1981, Dr. Leroy E. Hood, Superintendent of Schools for District No. 281, presented a report containing the school administration's recommendations on the school closing issue at a special Board meeting. This report came to be known as the "Bluebook." The administration took the position that closing Robbinsdale Senior High School was beyond serious consideration, and concluded that although keeping Cooper Senior High School open would save the maximum amount of money and preserve the most structurally sound building, Armstrong Senior High School also had the advantages of being the newest building and being best suited to a flexible modular scheduling program. The final choice would depend upon the policy priorities of the Board.

At a Board meeting held on October 19, 1981, the Board voted four to two to propose the closing of Cooper. Notice of the Board's intention to close was subsequently published on October 22, 1981, and October 29, 1981, in the North Hennepin Post, the official newspaper of the School District. Declining enrollment and the resulting impact on school finances were the reasons given in the notice for the proposed closure.

On November 16, 1981, at the regular Board meeting, a motion to close Cooper failed on a three to three tie vote. Chairman Webber had changed his vote to deadlock the Board. The same motion also failed on a three to three tie at the January 11, 1982, Board meeting. At subsequent Board meetings, numerous motions were made to propose the closure of each of the three high schools.

By January 18, 1982, it was obvious that the Board members were deadlocked on the issue of which high school to close. After Chairman Webber changed his vote on No-

vember 16, 1981, no votes were changed until January 18, 1982. Consequently, a compromise move to break the deadlock emerged. At the January 18, 1982, meeting a motion was made to add both Armstrong and Robbinsdale to the already existing proposal to close Cooper; this motion passed unanimously, resulting in a proposal to close all senior high schools in the District, though the Board never seriously intended that all three would in fact be closed. At the same January 18, 1982 meeting, the Board also passed a motion to create a "factfinding panel" to advise the Board as to which two high schools should remain open. Notice of the proposals to close Armstrong and Robbinsdale was published in the official newspaper of Independent School District No. 281. The same general reasons were given in the notices for the proposed closures of Armstrong and Robbinsdale as were given for the proposal to close Cooper—declining enrollment and the resulting impact on school finances.

At the February 4, 1982, Board meeting eight individuals were voted upon as members of the factfinding panel. The three individuals receiving the most votes agreed to serve on the panel. They were Robert Sheran, former Chief Justice of the Supreme Court of Minnesota, Dr. James Hetland, Jr., Adjunct Professor of Public Affairs, Business Administration and Law at the University of Minnesota and Senior Vice President of the First National Bank of Minneapolis, and Dr. John Maas, Executive Director of the Minnesota Association of School Administrators and former Superintendent of the Roseville schools. The panel members were instructed to recommend which two senior high schools would best serve the interests of Independent School District No. 281 for the foreseeable future, to receive no outside input except that permitted in their instructions, and to consider only the existing data compiled in the administration's "Bluebook." Each of their meetings, except one hearing, were private. The panel could only question the school administration through the American Arbitration Association. At least three

Board members stated publicly that they would support the recommendation of the private panel.

On February 8 and 10, 1982, the Board held public hearings on the closing of Armstrong and Robbinsdale, respectively. While the factfinding panel organized in private, the Board unanimously passed a motion to close all three high schools in the district at its February 22, 1982, meeting with the intention of reopening two of the schools. The factfinding panel toured each high school on March 13, 1982, and was accompanied, among others, by a parent representative for each high school who was not allowed to speak with the panel members. In addition to the tours, representatives of each high school made a 2½ hour presentation to the factfinding panel on March 26, 1982, with no comment or deliberations in public from the panel.

The factfinding panel's report was delivered to the individual Board members on April 26, 1982, and was not made public prior to the Board meeting scheduled for the next day. At the April 27, 1982, Board meeting, only the conclusions of the panel were read to the public and the Board, and no public comment was allowed. The panel had concluded that Cooper and Armstrong would best serve the interests of Independent School District 281 for the foreseeable future. A motion to reopen Cooper and Armstrong passed on a five to one vote.

During the time the Board was engaged in the process of determining which school to close, individual Board members gathered in private on at least 17 occasions and discussed the school closing issue. In addition to these face-to-face meetings, all of the Board members had numerous telephone conversations with other Board members concerning the school closing. On January 12, 1982, Board member Marofsky sent a letter to Board members Webber, Olson and Fuhrmann, attempting to persuade them to change their votes on the school closing issue.

At the conclusion of trial, the court found 14 separate violations of the Open Meeting Law and imposed a fine of $100 against each Board member. Respondents were held to have complied with the statutory notice and hearing requirements, and invalidation of actions taken as a result of secret deliberation was denied as a remedy that is not available under the Open Meeting Law.

We are asked to decide the following questions on appeal: whether respondents violated the hearing and notice provisions of Minn.Stat. § 123.36, subd. 11 (1982), in the course of closing Robbinsdale Senior High School; whether the trial court properly defined "meetings" under the Open Meeting Law as two or more members intentionally engaging in deliberations on Board business; and whether invalidation is available as a remedy under the Open Meeting Law.[1]

To initiate the process, notice of intention to close each high school was published in the official newspaper for the school district, giving as reasons declining enrollment and the resulting impact on school finances.[2] At this stage, the Board had little additional knowledge of the potential reasons for closing a particular high school; exploring the reasons for and against the retention of each school was precisely the purpose of the hearings that followed. Appellants and many other interested citizens participated fully in the many public meet-

---

1. Appellants also appeal the trial court's denial of attorney fees. Because we conclude that no violation of the Open Meeting Law occurred, we need not reach this issue.

2. The Schoolhouse Closing Statute, Minn.Stat. § 123.36, subd. 11 (1982), sets forth the following procedural requirements:

   The board may close a schoolhouse only after a public hearing on the question of the necessity and practicability of the proposed clos-

ing. Published notice of the hearing shall be given for two weeks in the official newspaper of the district. The time and place of the meeting, the description and location of the schoolhouse, and a statement of the reasons for the closing shall be specified in the notice. Parties requesting to give testimony for and against the proposal shall be heard by the board before it makes a final decision to close or not to close the schoolhouse.

ings and hearings that followed, and the fact that they did not anticipate the panel's ultimate recommendation and rationale did not deprive them of a meaningful voice in the process.

Appellants allege in their brief and at oral argument that the "ground rules" for the decision changed at the time the panel was engaged, shifting the focus from financial considerations to future educational needs of the district. We are unpersuaded that the Board's focus changed appreciably during the course of these events. Although a need to conserve financial resources prompted the initial decision to close one high school, it is unlikely that the Board ever intended to base its choice of which school to close wholly on financial grounds. On the contrary, substantial savings were predicted from closure of any of the three schools, and therefore appellants must have known from the outset that the decision would ultimately and logically turn upon the Board's primary objective of providing the best possible educational program for the district in the years to come.

Nor can we credit appellants' claim that they were lulled into believing that closing Robbinsdale was not a serious possibility. The Board was not bound by representations and advice of district administrators. There was a separate hearing on the closing of this school, and a separate motion to close Robbinsdale was presented to the Board; the possibility of its closing was never placed beyond consideration by the body having ultimate authority to make the decision.

█ The nub of this issue is whether another hearing was required between the Board's receipt of the panel's recommendations and its final vote to close a school. The notice and hearing provision of the statute, which has not previously been interpreted by this court, does not require an opportunity for rebuttal of all evidence or testimony. The Board complied with the statutory requirements by publishing the notice and receiving extensive public testimony at earlier stages. Such testimony is only one factor the Board must consider in reaching a decision, and information received after a public hearing may be considered, provided it is obtained in accord with the Open Meeting Law and the decision is based upon the reasons stated in the public notice and issues addressed in public hearings. *See* Op.Minn.Att'y Gen. No. 622j–1, at 6–7 (July 27, 1981). The trial court found no violation in the Board's use of the factfinding panel's recommendations, which were based upon facts obtained from public documents and open hearings. Since appellants fail to suggest how the panel's recommendations either conflicted with these facts or introduced new issues, the process followed in this case conforms to the statute's procedural requirements. The fact-gathering and deliberation process may continue until the Board feels confident that it is adequately prepared to decide the matter. In this case, the Board, which has wide discretion in such matters, chose to weigh the panel's recommendations heavily in making its decision. It was also capable of discounting any possible errors contained in the panel's report without submitting it to another round of public debate.

█ We do not minimize the significance of public input in situations as important as the closing of a neighborhood school. It is institutions such as Robbinsdale Senior High School which help to cement a community and impart to it an extra measure of vitality and spirit. When the utility of such institutions begins to conflict with other community exigencies, however, we look to the locally elected representatives to receive public input, and weigh and resolve such conflicts within the parameters of their statutory authority. In the case at hand, there was no alternative before the Board that would not have caused anguish to some segment of the community. When, as here, a governing body has followed applicable statutory procedures and its decision is supported by substantial evidence,[3]

---

**3.** We agree with appellants' statement at oral argument that the Board's decision was sup-   ported by substantial evidence.

the courts must uphold that decision though there be heartfelt opposition to it.

The second issue is whether the trial court properly defined "meetings" under the Minnesota Open Meeting Law as two or more members intentionally engaging in deliberations on Board business. The Open Meeting Law, Minn.Stat. § 471.705 (1982), does not define the "meetings" to which its terms apply, and is therefore indefinite with respect to (1) the number of officials that constitute a meeting and (2) the kinds of activities that fall within the purview of the law. The statute provides, in pertinent part,

> Except as otherwise expressly provided by statute, all meetings, including executive sessions, of any state agency, board, commission or department when required or permitted by law to transact public business in a meeting, and the governing body of any school district however organized, unorganized territory, county, city, town, or other public body, and of any committee, subcommittee, board, department or commission thereof, shall be open to the public * * *.

Minn.Stat. § 471.705, subd. 1 (1982).

The trial court found that Board members met privately in groups of from two to six on at least 17 different occasions. Fourteen of these gatherings were found to be violations of the Open Meeting Law. These conclusions were based on the court's determination that: "[T]he school board members were participating in a 'meeting' whenever they intentionally engaged in deliberation on matters presently pending before the board or matters that foreseeably would result in the taking of official action." That definition focuses entirely on the nature of the activity and assumes that a discussion between even two members may constitute a meeting in violation of the statute. Respondents challenge the trial court's definition of "meeting" and the conclusions of law based thereon.

Because these gatherings involved from two members to the entire Board, this case requires a comprehensive definition of what gatherings and activities constitute a "meeting" for purposes of the Open Meeting Law. We have addressed this question at the extremes in two of our recent opinions. In *St. Cloud Newspapers, Inc. v. District 742 Community Schools,* 332 N.W.2d 1, 4 (Minn.1983), we held that previously scheduled informational seminars about school board business, attended by the whole board, were within the purview of the law and must be publicized and open. This decision was based upon a presumption of openness in the wording of the statute itself, 332 N.W.2d at 5, and the general rule that open meeting statutes should be construed most favorably to the public, 332 N.W.2d at 4–5. Thus any "scheduled" gathering of all members of a governing body must be noticed and open, whether or not action is taken or contemplated. "This includes meetings at which information is received which may influence later decisions of such bodies," 332 N.W.2d at 6, but excludes "chance or social gatherings." 332 N.W.2d at 7.

The Open Meeting Law case which directly preceded *St. Cloud Newspapers* concerned fact situations at the opposite end of the spectrum, those of a city council member conferring one-on-one with another council member, and on a different occasion with a zoning commission member, about a pending license application. Finding that "all evidence was presented and all actions were taken at public meetings * * *," the court concluded no violation occurred. *Hubbard Broadcasting, Inc. v. City of Afton,* 323 N.W.2d 757, 765 (Minn.1983). That opinion focused primarily on available remedies, and did not purport to define what constitutes a "meeting" under the statute. Nevertheless, the decision clearly stands for the proposition that a discussion between two members of a governing body about a matter pending before that body is not a *per se* violation of the statute. After *St. Cloud Newspapers* and *Hubbard Broadcasting,* this court's remaining task is to determine whether the law applies to discussions

between any specific proportion of a public body less than the whole, but greater than two members.

The purposes of the statute were analyzed in depth in the *St. Cloud Newspapers* opinion and need not be reiterated here. However, in deciding that case there was no need to consider whether those same purposes must be balanced against other considerations when applied in a different factual situation. While the statute clearly requires a meeting of the whole to be noticed and open, it is not immediately clear whether the law applies to an informal discussion between a few members. The statute itself speaks only in terms of official units of the governing body: "[A]ll meetings, including executive sessions, of any state agency, board, commission or department * * * and of any committee, subcommittee, board, department or commission thereof * * *." Minn.Stat. § 471.705, subd. 1 (1982).

By statute, a majority of jurisdictions have confined the application of their open meeting laws to a majority or quorum of a public body, though some have done so impliedly by restricting the law's application to meetings at which action is or could be taken. *See* Note, *The Minnesota Open Meeting Law After Twenty Years—A Second Look,* 5 Wm. Mitchell L.Rev. 375, 390 nn. 70 & 72–73 (1979). The quorum requirement may be found within the terms of the Minnesota statute as well, since a "governing body" does in fact consist of a quorum[4] for purposes of acting with legal effect; the only relevant distinction between the whole body and its quorum is the proclivity of every member toward perfect attendance at meetings.

██ Legislative history suggests that the Open Meeting Law was enacted to prevent public bodies from dissolving into executive session on important but controversial matters, and to insure that the public has an opportunity both to detect improper influences and to present its views. Proceedings of the respective legislative committees also indicate that the law was not intended to apply to informal discussions between a few colleagues, or to groups too small to effect a decision on agency business. *See, e.g.,* Remarks of Senators Hubert H. Humphrey III and Rolf Nelson, Senate Governmental Operations Committee, April 20, 1973. There is a point beyond which open discussion requirements may serve to immobilize a body and prevent the resolution of important problems. In the instant case, for example, it appears that the private discussions were conducted for the purpose of breaking the deadlock rather than for achieving some secret intended result. All members participated in at least one private meeting, but no clear majority was working together, nor was there any suggestion of improper influence or untoward pressure exerted by any members. The Board was under great time pressure to reach a decision, and members sought out each other's views and positions in an effort to find some common ground. The decision to hire a factfinding panel was a neutral, fair-minded solution with no foreordained result.[5] This case may serve as an illustration that in formulating a definition of "meetings" that must be open, the public's right to be informed must be balanced against the public's right to the effective and efficient administration of public bodies. Contrary to appellants' position, it is the duty of public officials to persuade each other in an attempt to resolve issues, and it makes little sense to suggest that they may listen to a group of nonmembers on important matters but not to their colleagues, who may be more expert on the subject than any other persons. Intra-agency per-

---

4. Minn.Stat. § 123.33, subd. 5 (1982), defines a quorum of a school board as a majority of the voting members.

5. A school board cannot, of course, abdicate its responsibility of determining a school closing issue to an outside panel. Furthermore, a board should not ordinarily adopt such a pan-

el's recommendation without affording an opportunity to the public to react to the recommendation. In this case there had been more than ample opportunity for public debate and much actual debate. Further opportunity for the public to react to the panel's report would have been superfluous.

suasion and discussion become improper when designed to avoid public discussion altogether, to forge a majority in advance of public hearings on an issue, or to hide improper influences such as the personal or pecuniary interest of a public official.

We therefore hold that "meetings" subject to the requirements of the Open Meeting Law are those gatherings of a quorum or more members of the governing body, or a quorum of a committee, subcommittee, board, department, or commission thereof, at which members discuss, decide, or receive information as a group on issues relating to the official business of that governing body. Although "chance or social gatherings" are exempt from the requirements of the statute, *St. Cloud Newspapers, Inc. v. District 742 Community Schools,* 332 N.W.2d 1, 7 (Minn.1983), a quorum may not, as a group, discuss or receive information on official business in any setting under the guise of a private social gathering. The statute does not apply to letters or telephone conversations between fewer than a quorum.

Appellants correctly point out that this rule may be circumvented by serial face-to-face or telephone conversations between board members to marshal their votes on an issue before it is initially raised at a public hearing. It does not follow that two- or three-person conversations should be prohibited, however, because officials who are determined to act furtively will hold such discussions anyway, or might simply use an outsider as an intermediary. There is a way to illegally circumvent any rule the court might fashion, and therefore it is important that the rule not be so restrictive as to lose the public benefit of personal discussion between public officials while gaining little assurance of openness. Of course, serial meetings in groups of less than a quorum for the purposes of avoiding public hearings or fashioning agreement on an issue may also be found to be a violation of the statute depending upon the facts of the individual case.

Applying this definition to the case at bar, we find no instances that constitute violations. Of those violations identified by the trial court, only one involved a quorum or more of the Board.[6] This gathering, attended by all Board members, occurred in the superintendent's office shortly before a regular Board meeting. The trial court found that the members had come "to *hear* [the superintendent's] responses to questions put to him by the fact-finding panel."[7] (Emphasis added.) However, as respondents point out, the record does not support this finding. There was uncontradicted testimony of several witnesses that the superintendent distributed, but did not discuss, written copies of the questions and answers and invited Board members to give him their reactions individually after they had had an opportunity to read the material. Board member Marofsky, in a separate conversation with the superintendent overheard by one other Board member, suggested the panel be given copies of the district's open enrollment policy and a recently enacted state statute. These activities are not in the nature of group receipt of information or group discussion such that they constitute a "meeting" within the meaning of the Minnesota statute. The distribution of

---

6. The trial court identified one other gathering of a quorum, but did not find it to be a violation of the statute. This meeting, attended by four Board members, occurred at the invitation of the principal of Cooper Senior High School, and the Board members *did not know other members would be present.* One Board member left early, but it is unclear at what stage. Since appellants do not challenge the court's failure to find that this gathering was a violation, and because the record of what occurred there is unclear, we will not review the trial court's conclusion regarding this incident.

7. Attorneys for appellants, in their statement of facts, erroneously purported to quote the trial court's memorandum verbatim as follows:

"That at some point during the fact-finding panel's deliberations all six Board members met in private in the Superintendent's office to *discuss* his responses to questions put to him by the factfinding panel. * * *" (Emphasis added).

We have no doubt that the substitution of the significant word was inadvertent. However, it does point up the need for meticulous proofreading and cite checking of appellate briefs.

written questions and answers was functionally equivalent to receiving the information through the mail, which is permissible under our present holding. There was also no danger of forming a group consensus because no information was actually received until the material was read, and no discussion occurred. Similarly, the suggestion from Board member Marofsky occurred in the presence of only one Board member, and is therefore not a "meeting" under the statute. The conclusions of the trial court that respondent Board members violated the Open Meeting Law are accordingly hereby reversed.

 Appellants' final request that the closing be invalidated is inappropriate in its present posture. The traditional avenues for correction of improper acts by governing agencies are the writ of certiorari for review of quasi-judicial acts, and the declaratory judgment action for review of administrative and legislative acts. *Western Area Business and Civic Club v. Duluth School Board Independent District No. 708,* 324 N.W.2d 361, 364–65 (1982). Each public body is governed by certain empowering legislation defining its authority, and a review of its acts should be sought under the statute applicable to that body, and should be based upon the traditional criteria of abuse of discretion or action in excess of statutory authority. Where the legislature has prescribed the procedure to be followed in a particular situation such as closing a schoolhouse, the agency's actions are governed by that statute as well. *See, e.g.,* Minn.Stat. § 123.36, subd. 11 (1982).

Amicus curiae Minnesota School Boards Association correctly points out that a writ of certiorari is the proper form of action for challenging a school closing decision, rather than the declaratory judgment action brought in this case. *See Western Area Business & Civic Club v. Duluth School Board Independent District No. 708,* 324 N.W.2d 361, 365 (Minn.1982); *State ex rel. Ging v. Board of Education,* 213 Minn. 550, 563–65, 7 N.W.2d 544, 553 (1942). The standard of review for a writ of certiorari is the "substantial evidence" standard, *Honn*

*v. City of Coon Rapids,* 313 N.W.2d 409, 414 (Minn.1981), which goes to the underlying factual basis for the Board's decision. However, had appellants brought the appropriate action, the Board's decision to close Robbinsdale Senior High School would have been upheld at the trial court level, since by appellants' own admission there is substantial evidence in the record to support it. We agree with that conclusion.

Affirmed in part and reversed in part.