**Kenneth L. SOVEREIGN, individually and o/b/o the residents of the City of Lake Elmo, Appellant,**

v.

**Susan DUNN and Lee Hunt, individually and in their capacity as elected officials for the City of Lake Elmo, et al., Respondents.**

No. C1–92–1714.

Court of Appeals of Minnesota.

March 30, 1993.

Review Denied May 28, 1993.

John F. Bannigan, Jr., James J. Hanton, Bannigan & Kelly, P.A., St. Paul, for appellant.

Charles L. LeFevere, Holmes & Graven, Chartered, Minneapolis, for respondents.

Carla J. Heyl, League of Minnesota Cities, Shoreview, for amicus curiae League of Minnesota Cities.

Considered and decided by LANSING, P.J., and HARTEN and FOLEY, JJ.

## OPINION

DANIEL F. FOLEY, Judge.*

Kenneth Sovereign, a resident of the City of Lake Elmo, appeals from the trial court's dismissal of his action against respondent Lee Hunt for Hunt's alleged violation of Minnesota's open meeting law when Hunt, along with Lake Elmo's Mayor Susan Dunn, attended a series of nonpublic mediation sessions in an attempt to resolve a border dispute with the City of Oakdale. We affirm.

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

## FACTS

The cities of Lake Elmo and Oakdale are located adjacent to one another in Washington County. In January 1989, residents of Lake Elmo petitioned the Minnesota Municipal Board for detachment and annexation of section 32 and half of section 33 from Lake Elmo to Oakdale. The petitioners hoped to take advantage of sewer and water services available to Oakdale residents.

In March 1989, the Municipal Board informed Oakdale and Lake Elmo that it would commence hearings on the petition unless both cities submitted concurrent resolutions before April 15 of that year. *See* Minn.Stat. § 414.061 (1988). Lake Elmo's city council unanimously opposed the detachment and annexation. Officials from Lake Elmo and Oakdale agreed to employ a facilitator to assist them in negotiating a resolution of the border question. No agreement was reached before April 15, 1989, and the Municipal Board commenced hearings on the matter.

On May 31, 1989, the Lake Elmo City Council invited Roger Williams, Director of the Office of Dispute Resolution for the State Planning Agency, and Nancy Welsh, Director of State Mediation Services, to attend a special council workshop on the border question. Welsh suggested that a "representative council group" from Lake Elmo meet with a similar group from Oakdale to develop a list of issues. Lake Elmo City Council member Lee Hunt suggested that a "couple of" council members serve as representatives and provide regular updates to the full council. There was some discussion of the need to comply with the open meeting law, but no further action was taken at that time.

At a city council meeting on July 18, 1989, Lake Elmo Mayor Susan Dunn stated that she and Hunt, with council member Graves as an alternate, would attend an evening meeting with the Oakdale City Council on July 27. Hunt and Dunn eventually attended a series of meetings on the border question between July 1989 and May 1990. The circumstances surrounding the creation of this "delegation" from Lake Elmo were stipulated to by the parties as follows:

> No motion was made on [Mayor Dunn's] suggestion and no vote was taken. No resolution or ordinance was adopted. And no other type of formal action was taken to name the members of the delegation or to establish a committee.

> No specific instructions or charges were given to the representatives, and no authority or responsibility was specified or given except to exchange views and alternatives with Oakdale representatives, and to report back to the full council.

The stipulation further describes the delegation as follows:

> The delegation was not created pursuant to any statute, ordinance or resolution. It was not called a committee, and had no specific name. It had no organization other than the fact that there were two representatives and an alternate, and that it was to exchange views and alternatives with Oakdale representatives and report back to the full council.

> [The delegation] had no structure, by-laws or rules of procedure. No decisions or recommendations of the delegation had any legal standing. Any proposed agreement coming from the delegation would have to be acted on, after full deliberation, by the full city council at an open public meeting.

The stipulation also describes the Lake Elmo City Council's intent with respect to compliance with the open meeting law:

> The council had no purpose or intent to subvert or avoid the *open meeting law*. In fact, the city council discussed the need to comply with the Open Meeting Law and council member Hunt acted on the advice of Williams [of the Office of Dispute Resolution] that attendance at the mediation sessions by less than a quorum of the council would not violate the Open Meeting Law.

A quorum of the Lake Elmo City Council is three members. At no time were more than two city council members in attendance at the mediation sessions.

Other participants in the mediation sessions varied, and included the mediators,

members of Oakdale's city council, administrators from each city, property owners and members of the press. Various parties described these gatherings as "meetings," "negotiating sessions," or "mediations." No notice was provided of the time or place of these meetings, no minutes or other records were kept, and the public was not encouraged to attend. The meetings were not kept secret, however, and members of the public were not excluded from attending.

The purpose of these meetings was to explore mutually agreeable resolutions of the boundary adjustment and all related issues. Topics included municipal services, future boundaries, payment of deferred special assessments, and payment of sewer availability charges. All of the issues discussed related to the annexation and detachment of section 32 and part of 33, and no evidence suggests that any other issues were discussed.

On May 1, 1990, a local newspaper printed a story that reported negotiations were complete and Lake Elmo intended to give up section 32 without a public informational meeting. The minutes of that evening's city council meeting describe Mayor Dunn's reaction to the article as follows:

> Mayor Dunn responded that no decision on Section 32 has been made with Oakdale. The newspaper article was in error. Negotiations have been on-going between Oakdale and Lake Elmo appointed representatives, councilman Hunt and herself. When a proposal is reached, it will be brought before the entire council for their review.

In the same meeting, council member Hunt noted that a draft of a proposed agreement had been prepared by the negotiating teams with the input of property owners and was currently being reviewed by attorneys for both cities. When the document was finished, he stated, it would be presented to both councils and the public for public discussion. On May 15, 1990, a draft agreement was submitted to the city councils of Lake Elmo and Oakdale. Oakdale's city council voted to accept the agreement. Lake Elmo's city council, however, voted unanimously to reject it. The agreement was never presented to the municipal board.

The Municipal Board had been conducting independent public hearings on the detachment and annexation question throughout the period in question. These hearings were completed on May 15, 1990. Some time after this date, the Municipal Board ordered the detachment and annexation. The district court affirmed the Board's order, and the court of appeals affirmed the district court. The trial court in the present action found that proceedings before the Municipal Board were in no way affected by the mediation sessions between Oakdale and Lake Elmo.

On April 16, 1991, Kenneth Sovereign filed suit against Hunt, Dunn, and the City of Lake Elmo to obtain a declaration as to the applicability and enforceability of the open meeting law. He later dismissed the action against Dunn and the City of Lake Elmo. The trial court found no violation of the open meeting law and dismissed the action against Hunt. This appeal followed.

## ISSUES

1. Were mediation sessions in which the City of Lake Elmo was represented by less than a quorum of its city council members "meetings" subject to the provisions of the open meeting law?

2. Could two city council members be considered a "committee, subcommittee, board, department or commission" of the City of Lake Elmo for purposes of the open meeting law?

## ANALYSIS

■ The issues before this court require interpretation of Minnesota's open meeting law, Minn.Stat. § 471.705 (1988). Statutory construction is a question of law. *Hibbing Educ. Ass'n v. Public Employment Relations Bd.*, 369 N.W.2d 527, 529 (Minn.1985). This court is not bound by and need not give deference to the trial court's determination of purely legal questions. *See Frost–Benco Elec. Ass'n v. Minnesota Pub. Utils. Comm'n*, 358

N.W.2d 639, 642 (Minn.1984); *A.J. Chromy Constr. Co. v. Commercial Mechanical Servs., Inc.*, 260 N.W.2d 579, 582 (Minn. 1977).

■ The open meeting law was enacted in 1957. 1957 Minn.Laws ch. 773, § 1. It states that all meetings, including executive sessions of the "governing body" of any city "and of any committee, subcommittee, board, department or commission thereof, shall be open to the public." Minn.Stat. § 471.705, subd. 1. Open meeting laws are enacted for the public benefit and should be liberally construed. *St. Cloud Newspapers, Inc. v. District 742 Community Schs.*, 332 N.W.2d 1, 4–5 (Minn.1983).

1. The test for determining whether a particular meeting is subject to the open meeting law was established in *Moberg v. Independent Sch. Dist. No. 281*, 336 N.W.2d 510, 518 (Minn.1983). In *Moberg*, members of a school board met privately in groups of less than a quorum on at least 17 different occasions. *Id.* at 516. The purpose of these meetings apparently was to break a deadlock between voting members of the board on a school closing issue. *Id.* at 517. The court held that "the public's right to be informed must be balanced against the * * * effective and efficient administration of public bodies." *Id.* Applying this test, the court found that meetings which must be open are

> those gatherings of a quorum or more members of the governing body, or a quorum of a committee, subcommittee, board, department, or commission thereof, at which members discuss, decide, or receive information * * *.

*Id.* at 518. Accordingly, the court found that the meetings of the school board did not violate the open meeting law. *Id.*

The quorum requirement in *Moberg* reflects the supreme court's unwillingness to subject gatherings of public officials to the open meeting law where the group lacks power to "actually transact business."

*Minnesota Daily v. University of Minn.*, 432 N.W.2d 189, 193 (1988), *pet. for rev. denied* (Minn. Jan. 25, 1989). *Cf. Minnesota Educ. Ass'n v. Bennett*, 321 N.W.2d 395, 397 (Minn.1982) (the open meeting law applies to "governing bodies," a phrase which inherently limits the reach of the law to bodies vested with decision-making authority.)

■ As the parties to the present action stipulated, any proposed agreement deriving from the mediation sessions could not be acted upon without "full deliberation, by the full city council at an open public meeting." It is clear that the Lake Elmo delegation lacked the power to transact public business, and that the mediation sessions were not "meetings" as contemplated by the open meeting law.[1]

2. Sovereign points out that the open meeting law extends not only to the council itself but to "any committee, subcommittee, board, department or commission thereof." Minn.Stat. § 471.705, subd. 1. He distinguishes the present case from *Moberg* by asserting that Hunt and Dunn in fact comprised a "board," "commission" or "committee" of the council. Because the statute does not define these terms, Sovereign suggests that this court adopt their definitions in Black's Law Dictionary, as follows:

> **Board.** An official or representative body organized to perform * * * official or representative functions * * *.
>
> \* . \* \* \* \* \*
>
> Group of persons with * * * investigatory functions and power.
>
> **Commission.** * * * A board or committee officially appointed and empowered to perform certain acts or exercise certain jurisdiction of a public nature or relation * * *.
>
> **Committee.** * * * An individual or body to whom others have delegated or committed a particular duty, or who have taken on themselves to perform it in the

---

1. Meetings of less than a quorum may violate the open meeting law if held "to avoid public discussion altogether, to forge a majority in advance of public hearings * * *, or to hide improper influences." *Moberg*, 336 N.W.2d at 518. No evidence suggests that the Lake Elmo delegation engaged in such conduct or intended to do so.

expectation of their act being confirmed by the body they profess to represent or act for.

*Black's Law Dictionary* 157–158, 246, 248 (5th ed. 1979).

We find that adoption of the broad and nebulous standards above would prevent balancing the public's "right to be informed" against the "effective and efficient administration of public bodies." *Moberg*, 336 N.W.2d at 517. As the supreme court stated in *Moberg:*

> There is a point beyond which open discussion requirements may serve to immobilize a body and prevent the resolution of important problems.

*Id.* Determining this point requires more than the rote application of dictionary definitions.

 Legislative history indicates that the 1973 amendment which brought committee meetings within the open meeting law was intended to prevent a public body from avoiding the restrictions of the statute by resolving "itself into a committee of the whole." *Hearing on S.F. 1480 Before the Senate Governmental Operations Committee* (April 20, 1973) (statement of Sen. Hubert H. Humphrey, III, one of the authors of the 1973 amendment), cited in *Daily*, 432 N.W.2d at 192. The legislature did not intend to extend the open meeting law to "informal discussions between a few colleagues, or to groups too small to effect a decision on agency business." *Moberg*, 336 N.W.2d at 517.

In *Daily*, this court considered whether a committee formed by the Board of Regents of the University of Minnesota to assist it in its search for a new president was subject to the open meeting law. *Daily*, 432 N.W.2d at 192–94. The regents themselves were not members of the committee. *Id.* at 192. Resolution of the case, we found, turned on whether the meetings were, "in effect, the deliberations of the regents." *Id.* In finding that there was no violation, we noted that the committee had the power to recommend candidates for the position and the obligation to report its findings, "but no power to *decide* who the next

president [would] be." *Id.* at 193 (emphasis in original).

Sovereign argues that a committee empowered to "deliberate" exercises a function of the governing body and is subject to the open meeting law. He cites *St. Cloud* for the proposition that the open meeting law was intended to apply not just to meetings where action is taken but to meetings conducted for the limited purpose of gathering information. *See St. Cloud*, 332 N.W.2d at 6; *see also* Op.Att'y Gen. 63–a–5 (Oct. 28, 1974) (the open meeting law applies to deliberations as well as formal actions.)

In *St. Cloud*, however, every member of the governing body was present at the meetings in question. *St. Cloud*, 332 N.W.2d at 3. By comparison, discussions between two city council members did not violate the open meeting law even when the meeting was related to specific pending matters. *Hubbard Broadcasting, Inc. v. City of Afton*, 323 N.W.2d 757, 765 (Minn. 1982). As this court noted in *Daily*, "Both of these cases [ (*St. Cloud* and *Hubbard* ) ] emphasized the identity and number of attendees at a meeting." *Daily*, 432 N.W.2d at 192.

 Accordingly, we hold that a gathering of public officials is not a "committee, subcommittee, board, department or commission" subject to the open meeting law unless the group is capable of exercising decision-making powers of the governing body. The capacity to act on behalf of the governing body is presumed where members of the group comprise a quorum of the body. It could also arise where there has been a delegation of power from the governing body.

 The Lake Elmo delegation did not constitute a quorum of the city council, nor did it exercise any authority on behalf of the council. The delegation was created informally without a vote or resolution on the matter; no powers were granted the delegation by statute, ordinance, or other formal action. Though the mediation sessions produced a negotiated agreement, this agreement was presented to the city council in an open meeting with ample op-

**68**

portunity for public involvement. We hold that the Lake Elmo delegation did not constitute a "committee, subcommittee, board, department or commission" of the Lake Elmo City Council for purposes of the open meeting law.

Because the open meeting law was not violated in this instance, we need not address whether violations were "unrelated" for the purpose of determining the proper sanctions.

### DECISION

The trial court properly dismissed the action against city council member Lee Hunt for violation of the open meeting law.

**Affirmed.**