834 VOICE, Relator,

v.

INDEPENDENT SCHOOL DISTRICT
NO. 834, STILLWATER, Minnesota,
Respondent.

A16-0472

Court of Appeals of Minnesota.

Filed April 3, 2017

Frederic W. Knaak, Holstad & Knaak, PLC, St. Paul, Minnesota (for relator)

Peter G. Mikhail, Elizabeth Brodeen-Kuo, Kennedy & Graven, Chartered, Minneapolis, Minnesota (for respondent)

Considered and decided by Ross, Presiding Judge; Stauber, Judge; and Rodenberg, Judge.

## OPINION

RODENBERG, Judge

By writ of certiorari, relator 834 VOICE challenges the decision of the school board (the Board) of respondent Independent School District No. 834 (ISD 834), Stillwater, Minnesota, to close the Marine, Withrow, and Oak Park elementary schools. Relator challenges the speaking-time limits and other procedural rules concerning the school-closing hearing, and also argues that the Board's finding that closing the schools is necessary and practicable is not supported by substantial evidence. We affirm.

## FACTS

Beginning in 2012, the respondent school district began developing a strategic plan called Bridge to Excellence. District leaders reviewed demographic trends and projections, and eventually reviewed a 2014 report by demographer Hazel Reinhardt. Reinhardt's report attempted to project future enrollment in the district schools. She predicted that, under the "cohort survival method" of projecting, enrollment would either decline or rise only slightly over ten years. Under the "housing unit method" of projecting, there would be "some enrollment growth." As part of a long-range facilities plan that included building a new school in the southern part of the school district, district voters approved a levy in 2013 and a bond measure in 2015. The Board urged voters to approve the 2015 bond measure. In its proposal to the Minnesota Department of Education, the Board cited the Reinhardt report's projection of "stable to moderate growth in student enrollment over the next 5 years, but with some geographic shifting in student population location."

A new school-district superintendent was hired in July 2015, after the May 2015 vote approving the bond measure. At a December 17, 2015 board meeting, the new superintendent presented a new strategic plan for the Board's consideration, entitled "Building Opportunities to Learn and Discover" (BOLD). One of the BOLD proposals was closing three of the district's elementary schools and consolidating students into the remaining schools. The superintendent stated that the school closures are necessary because school enrollment is declining, the district is operating schools below capacity, students are having inequitable educational experiences,

and budgetary constraints are creating instability in student programming. District staff supported these statements with data from the Reinhardt report, a Metropolitan Council report, a capacity study conducted in 2014, and other data.

The BOLD proposal generated vigorous community opposition. A survey commissioned by the Board revealed that a majority of residents and parents of children attending schools in ISD 834 opposed BOLD. Nonetheless, the Board proceeded with a series of "learning sessions" and "listening sessions" where district staff explained the reasoning behind the BOLD proposal. Community input was received. Following these sessions, and desirous of making a decision concerning the proposed school closings, the Board held a final public hearing under Minn. Stat. § 123B.51, subd. 5, on March 3, 2016. At that hearing, district staff, including the superintendent, presented the BOLD proposal and took questions from the Board. The Board then took public testimony, limiting each speaker to three minutes. Forty-four people who had signed up to speak, plus one additional person who had not signed up, testified at the hearing. The Board also accepted into the record a 305-page report from relator.[1]

After this several-hour public hearing, the Board voted 5-2 to adopt a resolution closing the three elementary schools. The resolution included findings of fact supporting the school closures, which mirrored the reasons originally given by the superintendent when she introduced the BOLD proposal. The resolution also identified reasons for the closure of those specific elementary schools, and explained why other elementary schools in the district were not closed.

This certiorari appeal followed.

1. Relator is an association opposed to the school closings in ISD 834. The record does not reveal the precise nature or composition of the association, but respondent does not challenge standing or any other procedural aspect of relator's certiorari appeal.

## ISSUES

I. Did the March 3, 2016 hearing fulfill the statutory requirements of Minn. Stat. § 123B.51, subd. 5, concerning a school-closing hearing?

II. Is the Board's decision to close the Marine, Withrow, and Oak Park elementary schools supported by substantial evidence?

## ANALYSIS

### Overview of Judicial Review of School Board Decisions

School boards are empowered by the Minnesota legislature, and entrusted by the district residents who elect them, with the authority to conduct the affairs of school districts. This authority includes the power to open, close, or reorganize schools "as [the board] may deem advisable." Minn. Stat. § 123B.02, subd. 2 (2016). The legislature has vested locally elected school boards with these powers to enable them to "discharge [their] various duties to the residents of the school district," by "develop[ing] educational objectives and ... manag[ing] available resources to achieve those goals." *W. Area Bus. & Civic Club v. Duluth Sch. Bd. Indep. Dist. No. 709*, 324 N.W.2d 361, 363 (Minn. 1982).

A school board's decisions are entitled to judicial deference, and we will not substitute our own judgment for that of a board. *Id.* at 365 (observing that a court reviewing the decision of a school board "must not put itself in the place of the Board, try the matter *de novo* and substitute its findings for those of the Board"); *Kelly v. Indep. Sch. Dist. No. 623*, 380 N.W.2d 833, 836 (Minn.App. 1986). Our limited review of a school board's decision considers whether the challenged act of the school board is "fraudulent, arbitrary, unreasonable or not supported by substantial evidence on the record; not within its

jurisdiction; or based on an erroneous theory of law." *Foesch v. Indep. Sch. Dist. No. 646*, 300 Minn. 478, 485, 223 N.W.2d 371, 375 (1974).

The law explicitly requires that a school board hold a public hearing before it resolves a school-closing question. Minn. Stat. § 123B.51, subd. 5. The law mandates that the issue be resolved by the Board as it "may deem advisable." Minn. Stat. § 123B.02, subd. 2. The closure of a school is recognized as having a particularly important and significant impact on a community because schools have traditionally played important roles as "centers for public meetings, elections, social and recreational activities, and other community purposes." *W. Area Bus. & Civic Club*, 324 N.W.2d at 364. School-closing decisions are by their nature political decisions, entitled to judicial deference and respect because the decision to close a school is so important to the local community. For that reason, courts decline to substitute their judgment for the judgment of locally elected officials, who are both most familiar with the community's issues and most directly accountable to the voters. *Moberg v. Indep. Sch. Dist. No. 281*, 336 N.W.2d 510, 515 (Minn. 1983) (noting a school board's "wide discretion" in school-closing decisions, and observing that it is for "the locally elected representatives to receive public input, and weigh and resolve [school-closing] conflicts").

### I. The March 3, 2016 public hearing conformed to the requirements of Minn. Stat. § 123B.51, subd. 5.

We first address relator's contention that the hearing held on March 3, 2016 did not meet the statutory requirements for a school-closing hearing because each commenter was limited to speaking for three minutes, and because persons

making comment were not permitted to merge their time.

The law requires that a school board hold a public hearing before closing a school. Minn. Stat. § 123B.51, subd. 5. The statute requires that the board give notice of the hearing and that "[p]arties requesting to give testimony for and against the proposal shall be heard by the board before it makes a final decision to close or not to close the schoolhouse." *Id.* The statute requires a school board to hold "a public hearing on the question of the necessity and practicability of the proposed closing." *Id.*; *Concerned Citizens for the Pres. of Indep. Sch. Dist. No. 712 v. Mountain Iron-Buhl Indep. Sch. Dist. No. 712*, 431 N.W.2d 601, 604 (Minn.App. 1988) (applying Minn. Stat. § 123.36, subd. 11 (1986), a previous version of the statute at issue), *review denied* (Minn. Jan. 25, 1989).

We have held that the statutory requirement for a hearing is "satisfied when interested parties are given an opportunity to speak for or against a proposal to close a schoolhouse." *Bena Parent Ass'n v. Indep. Sch. Dist. No. 115*, 381 N.W.2d 517, 520 (Minn. App. 1986). The Minnesota Supreme Court has previously declined to impose detailed requirements on local-government hearings. *See Kletschka v. Le Sueur Cty. Bd. of Comm'rs*, 277 N.W.2d 404, 405 (Minn. 1979) ("[B]asic rights of procedural due process require reasonable notice of hearing and a reasonable opportunity to be heard; but such hearing does not invoke the full panoply of procedures required in regular judicial proceedings."). And we have specifically declined to impose any additional due process requirement on a school-closing hearing. *Bena*, 381 N.W.2d at 521.

■ The parties agree that each speaker at the March 3, 2016 hearing was limited to three minutes of speaking time. Some of the speakers at that hearing were advised that their allotted time had expired. Of those who were so advised, all concluded their remarks after, at most, a few additional summary comments. The process was orderly. As each speaker was called, the succeeding two speakers were identified, so that they might ready themselves to speak. The parties also agree that the Board expressly prohibited multiple speakers from combining their time. No speaker's three minutes could be expanded by another speaker ceding a portion of his or her time. Relator argues that this process failed to meet the statutory requirements. "We review the application of a statute to the undisputed facts of a case as a question of law, which is subject to de novo review." *Terminal Transp., Inc. v. Minn. Ins. Guar. Ass'n*, 862 N.W.2d 487, 491 (Minn.App. 2015), *review denied* (Minn. June 30, 2015).

The March 3, 2016 public hearing was the last of a series of public forums on the school-closing question. At several earlier forums, public comment was taken. But we consider only whether the final hearing on March 3 fulfills the statutory requirements of a public hearing. That was the only hearing held after the notice required by Minn. Stat. § 123B.51, subd. 5. The March 3 hearing included an extensive presentation from the superintendent and school district staff in support of the BOLD proposal. Community members who spoke were limited as noted. The Board announced the time restrictions as being necessary "to encourage community participation and to conduct [the hearing] efficiently." Both parties agree that relator submitted, and the Board accepted into the record, a 305-page report prepared by relator.

The statute requires that "[p]arties requesting to give testimony for and against the proposal shall be heard by the board." *Id.* In *Bena*, we considered whether, in a

school-closing hearing under the predecessor statute to Minn. Stat. § 123B.51, subd. 5, the legislature's use of the term "testimony" required that public comment at such a hearing be given under oath. 381 N.W.2d at 520. In that case, the challenge to the school board's procedure included a contention that the board ought to have employed a hearing officer, as is required in teacher-termination cases. *Id.* We noted that a school board acts in a quasi-judicial capacity in teacher-termination cases. *Id.* Such a case involves the inherent tension between a school board's "local control of teacher discipline" on the one hand, and avoidance of arbitrary dismissal of a teacher on the other. *Id.* In the teacher-termination context, fundamental fairness requires due-process protections. *Id.* In contrast, *Bena* noted that a school board's "role and range of discretion is different in teacher termination and school closing cases," the latter not involving "the same opportunity for arbitrary action against an individual." *Id.* at 521. We therefore declined to require that school boards either take testimony under oath or engage the services of a hearing officer in school-closing cases, leaving to the "wide discretion" of local boards the details of how to conduct public hearings. *Id.* at 520-21.

◼ We are guided here by the approach taken in *Bena*. The legislature, in enacting section 123B.51, subdivision 5, included no requirement of any minimum time that must be allotted to each person testifying at a school-closing hearing. The legislature likewise included nothing in the statute concerning whether speakers could combine their time. Just as relator invites us to judicially impose a prohibition not contained in the statute on limiting speakers to three minutes each, and invites us to add to the statute a requirement that a school must permit speakers to combine their allotted speaking time, we suppose that a multitude of other hearing procedures might be suggested.[2] But how a school board chooses to conduct a school-closing hearing is entitled to judicial deference and respect as we recognized in *Bena. Id.* The legislature has entrusted the conduct of school-closing hearings to school boards and not to this court. *See* Minn. Stat. § 123B.51, subd. 5 (providing statutory requirements a board must follow before a school closing).

◼ We suppose that, at some point, restrictions on speaking time or other hearing procedures might so limit the opportunity to speak as to render meaningless the opportunity for the public "to give testimony for and against the proposal." *Id.* But where, as here, the hearing procedures established by a school board are reasonable and allow a meaningful opportunity for the public testimony contemplated by the statute, the procedures adopted by the board are entitled to judicial deference and respect. It is not for us, as a

---

**2.** By way of example, the Board in this case requested that persons wishing to speak at the hearing sign up to do so. The statute neither requires nor prohibits this method of organizing speakers, but it makes good sense for a school board to so organize the speakers. Those wishing to speak were, by this method, called on in an orderly fashion. As the hearing proceeded, the Board commendably allowed an additional citizen—one who had not registered to speak—the opportunity to address the Board. Whether the Board should have required a sign-up process, whether and under what circumstances it should allow variance from that process, and similar questions, are not now before us. But were we to judicially impose detailed requirements in school-closing hearings—requirements not contained in the statute under which the hearing is held—we can imagine that every future challenge to a school-closing hearing would include a request for additional judicial intervention in and prescription of the hearing process. This is not what the legislature did, nor can it be what the legislature intended, in enacting section 123B.51, subdivision 5.

statewide error-correcting court, to manage the details of the hearing procedures of 512 Minnesota public school districts and charter schools.[3] "The function of the court of appeals is limited to identifying errors and then correcting them." *Sefkow v. Sefkow*, 427 N.W.2d 203, 210 (Minn. 1988); *Lake George Park, L.L.C. v. IBM Mid-America Emps. Fed. Credit Union*, 576 N.W.2d 463, 466 (Minn.App. 1998) (stating that "[t]his court, as an error correcting court, is without authority to change the law"), *review denied* (Minn. June 17, 1998).

We have carefully reviewed the record of the March 3, 2016 hearing. The hearing procedures adopted and enforced by the Board were reasonable. The Board allowed 45 speakers. It excluded none. Relator's proffered 305-page report was received into the record, and each member of the public wishing to address the Board was afforded what the Board determined to be a reasonable time "to give testimony for and against the proposal." Minn. Stat. § 123B.51, subd. 5. The procedure used by the Board did not violate section 123B.51, subdivision 5.

## II. The Board's decision is supported by substantial evidence.

 Relator challenges the Board's decision to close the schools as unsupported by substantial evidence. In its resolution closing the schools, the Board identifies a number of reasons for the closings. These reasons fall into four broad categories: (1) enrollment is projected to decline overall in the district, and particularly in the north and central parts of the district where the three schools to be closed are located; (2) schools are operating below capacity; (3) schools are providing inequitable learning experiences; and (4) budgetary constraints on the district are leading to instability.

 School boards have statutory authority to close a school after determining that the closing is necessary and practicable. Minn. Stat. § 123B.02, subd. 2, .51, subd. 5; *Bena*, 381 N.W.2d at 519. When reviewing a school board's decision that closing a school is necessary and practicable, we consider whether the board's determination is supported by substantial evidence. *Kelly*, 380 N.W.2d at 836. "Substantial evidence is: 1. [s]uch relevant evidence as a reasonable mind might accept as adequate to support a conclusion; 2. [m]ore than a scintilla of evidence; 3. [m]ore than some evidence; 4. [m]ore than any evidence; and 5. [e]vidence considered in its entirety." *Id.* It does not matter that a school board decides contrary to the many expressed opinions of the public. *W. Area Bus. & Civic Club*, 324 N.W.2d at 365. When reviewing the record, we consider whether the record supports the closure of the particular school or schools under consideration. *Kelly*, 380 N.W.2d at 837. General data that only support closing *a* school will be considered insufficient. *Id.* We will affirm a school board's decision when the data provide a substantial basis for the board's action, and particularly when the question is debatable and requires board members to exercise their "administrative judgment." *W. Area Bus. & Civic Club*, 324 N.W.2d at 365. With these principles in mind, we turn to examination of the record in the four areas identified as supporting these particular school closings.

### A. Declining Enrollment

The Board found that the school district's enrollment is decreasing, and stated

---

**3.** Minn. Dep't of Educ., *Districts with Statutory Operating Debt* (2017), http://education. state.mn.us/MDE/about/rule/leg/rpt/rep17/ (follow "Districts with Statutory Operating Debt for FY 2016" hyperlink).

that "the number of people per household is projected to decrease, according to the Met[ropolitan] Council, by 5.2 percent county-wide between 2014 and 2030, which means there will be fewer children living within the school district in the next 15 years." The Board also found that "Demographer Hazel Reinhardt predicts that the school district's enrollment will hold stable or slightly decline through ... 2019, with increases in the south, but decreases in the central and north areas of the school district."

Relator argues that the Board misinterpreted the evidence on which it concluded that the district population would decrease. Relator notes that, in urging the voters to support the 2015 bond measure, the Board had previously used the Reinhardt report to support the notion that district enrollment would *increase*. Relator also points out that the Metropolitan Council data only show a decline in population per household, and not an overall population decrease. In the voluminous document it submitted to the Board at the March 3 meeting, relator conceded that the projected 5.2% decrease in people per household was correct, but argued that the same graph projected a 20.1% increase in population in spite of the per-household decrease. Relator argues that, because the number of households is projected to increase, the area population will likely increase. The Metropolitan Council report predicts the number of households in the southern part of the district will grow significantly between 2010 and 2040, while the number of households in the north and central part of the district will remain stable or increase only slightly.

The data in the voluminous record admit of more than one conclusion concerning future population growth and district enrollment. The Reinhardt report contains one model showing a decline or slight growth in enrollment and another showing more enrollment growth. The Metropolitan Council report does predict a growth in total population but, as the Board points out, a population increase does not necessarily equate to an increase in the number of school-age children. And there is evidence in the record supporting the Board's finding that school-age population will likely not increase in the central and north parts of the district, while increases are projected in the south. Given conflicting evidence and projections in the record, the Board was required to exercise its discretion to resolve conflicts in the available evidence and to draw inferences from the data. *City of N. St. Paul v. Minn. Water Res. Bd.*, 260 N.W.2d 584, 587 (Minn. 1977). Our deference to the Board's exercise of its discretion is at its apex in instances like this, where "the question is debatable and requires elected officials to exercise their administrative judgments." *W. Area Bus. & Civic Club*, 324 N.W.2d at 365. Although the Board might well have concluded otherwise, there is substantial evidence in the record to support its determination that future enrollment projections supported its decision to close the three elementary schools.

### B. Schools Operating Below Capacity

The Board's resolution stated that current elementary school enrollment is 94.3% of capacity, but that the percentage-of-capacity figure is projected to drop to 79% in the 2017-2018 school year. While relator does not attack the source of this finding, it argues that this finding is different from a 2014 capacity study conducted and approved by the district.

The district's findings regarding future enrollment decreases come directly from its 2015-2016 enrollment study. This information supports the Board's finding that the district's elementary schools are operating below capacity. There is evidence to

the contrary in the record. But, as discussed above, the Board is the entity authorized by statute to consider and weigh competing evidence concerning proposed school closings. The record might have supported rejecting the October 2015 study, but the Board acted within its discretion in crediting this study over other evidence. This finding is supported by substantial evidence.

### C. Inequitable Learning Experiences Being Provided by Different Schools

The Board found that inequalities being experienced by elementary students in different schools within the district supported the closure of these three particular schools. It based this conclusion on findings that the per-student spending varied between schools by as much as $1,600 per student, that average class sizes are significantly different at different schools, and that different schools receive differing levels of support from travelling education specialists. Relator admits that some schools must share specialists under the current complement and configuration of elementary schools and that per-pupil costs differ from school to school. But relator argues that these concerns amount only to a "hypothetical suggestion" of inequity, and that consolidation will not necessarily solve these issues.

The Board based its findings on information presented by school staff concerning inequitable learning experiences. Relator does not dispute that the record contains information on which the Board's determination rests. While relator may disagree with the Board's conclusions, evidence in the record supports the Board's findings. And we defer to school-board findings that are supported by the record. *Moberg*, 336 N.W.2d at 515-16.

### D. Budgetary Constraints

Finally, the Board found that budgetary constraints had created instability in programming, and that closing the Marine, Oak Park, and Withrow elementary schools would help alleviate budget problems. The Board specifically found, among other things, that budget restrictions had been necessary for 10 of the past 15 years and that closing the Marine, Oak Park, and Withrow elementary schools would annually save a projected $1.2 million. Relator does not challenge the finding that the district has had budget restrictions in the past. Instead, relator argues that the Board should find different solutions to the budget issues, such as decreasing salaries for administrators. Relator also challenges the Board's finding that closing these three schools will save $1.2 million per year, arguing that other schools will incur increased costs to accommodate transferred students, and those cost increases will offset the projected savings.

The Board's findings are based on an operating budget that includes the costs of running the three elementary schools and estimates of future budgets after those schools close. The record supports the finding that closing the schools will result in decreased costs to the district. Although the Board could have found other budget solutions, it is not our proper role to assume management of the school district or its finances. The Board's budgetary findings are supported by substantial evidence in the record.

Substantial evidence in the record supports each of the Board's findings. Based on these findings, the Board concluded that closing the three schools is necessary and practicable. While the record would have supported other conclusions, it is not for us to reweigh the evidence. *W. Area Bus. & Civic Club*, 324 N.W.2d at 365; *Moberg*, 336 N.W.2d at 515-16. Neither is

it our role to assess the wisdom of the Board's decision. Our system of government depends on citizens' selection and oversight of elected officials to make political decisions. As one speaker commented at the March 3, 2016 hearing, "If you decide to vote yes, I ... will never vote for you guys, and I'll go push so you all are not reelected." Influencing elected officials through the political process is not only an appropriate response to the actions of elected officials, it is fundamental to maintaining a representative democracy. Whether the Board's school-closure decision was a good one is a question not before us on certiorari review. The school-closure decision lies within the realm of decision-making entrusted by the legislature to the judgment of the Board, and its decision is reasonably supported by substantial evidence in the record.

## DECISION

The March 3 school-closing hearing afforded a reasonable opportunity for interested parties to testify on the question under consideration. The hearing process conformed to the requirements of Minn. Stat. § 123B.51, subd. 5, and the resulting Board decision to close the schools is supported by substantial evidence in the record.

**Affirmed.**