MINNESOTA STATE HIGH SCHOOL LEAGUE: Questions concerning the nature, governance and powers of the League discussed. Minn. Stat. §§ 10A.071, 15.0575, 118A.04, 118A.05, 128C.01, 128C.10, 128C.15, 128C.22, 471.345, 471.705, 471.895 (1998).

1035
(Cr. Ref. 170c)

August 23, 1999

Judith Dutcher
Minnesota State Auditor
Office of the State Auditor
525 Park Street, Suite 400
St. Paul, MN 55103

Dear Ms. Dutcher:

In a letter to the Attorney General you have posed a number of questions concerning the composition and actions of the Minnesota State High School League ("the League") as follows:

## FACTS

The League is governed by a twenty-member governing board. Four of the members are appointed by the governor. These members have, currently, terms that run from January 1 to December 31, whereas the remaining 16 members have terms that run from August 1 through July 31.

## QUESTION I

Are the starting and ending dates of the terms of all members of the League's board of directors governed by Minn. Stat. § 15.0575?

## OPINION

We answer your question in the negative. Prior to 1999, Minn. Stat. § 128C.01, subd. 4 provided:

(a)     The league must have a 20-member governing board.

(1)     The governor must appoint four members according to section 15.0597. Each of the four appointees must be a parent. At least one of them must be an American Indian, an Asian, a Black, or a Hispanic.

(2)     The Minnesota association of secondary school principals must appoint two of its members.

(3)     The remaining 14 members must be selected according to league bylaws.

(b)     The terms, compensation, removal of members, and the filling of membership vacancies are governed by section 15.0575.

Pursuant to that language, it seems clear that the terms of all members were to be governed by section 15.0575 which provided for members' terms to end the first Monday in January.

In 1999, the legislature amended Section 128C.01 subd. 4 (b) as follows:

(b) The terms, compensation, removal of members, and the filling of membership vacancies are governed by section 15.0575, *except that the four-year terms begin on August 1 and end on July 31. As provided by section 15.0575, members who are full-time state employees or full-time employees of school districts or other political subdivisions of the state may not receive any per diem payment for service on the board.*

Act of May 25, 1999, ch. 241, art. 9 § 37, 1999, Minn. Laws 1920, 1041.

This amendment was effective on May 26, 1999. *Id.*, art. 9 § 55. Consequently, the January term-ending dates as provided in section 15.0575 no longer apply and member terms are to begin on August 1 and end on July 31.

## FACTS

The League is prohibited by Minn. Stat. § 128C.10, subd. 2 from having credit cards. Apparently, the League has arranged with certain hotels and airlines to bill the League itself directly for expenses of its board members and employees on a monthly basis rather than demanding payment from the officer or employee at the time the service is received.

## QUESTION II

Do these direct billing arrangements violate the statutory prohibition against the League having credit cards?

## OPINION

Based upon the information submitted, we answer your question in the negative. Minn. Stat. § 128C.10, subd. 2 states: "The League cannot have credit cards." That language does not, by its terms, prohibit the League from engaging in credit transactions generally. Rather, it merely prohibits the use of a particular type of credit instrument. The term "credit card" is not specifically defined in Minn. Stat. ch. 128C. Thus, it must be assumed that the legislature intended the term to be used in its commonly understood sense[1] *viz.* "A card issued by a bank or business authorizing the holder to buy goods or services on credit." *The American Heritage College Dictionary* (Third Edition, 1997).[2] The facts provided do not indicate that the businesses with which the League has established a credit relationship have issued to the League any such cards.

Thus it is our opinion that the billing arrangements described are not contrary to the prohibition of Minn. Stat. § 128C.10, subd. 2.

## FACTS

The League is expressly made subject to particular laws pertaining to units of government. These include the Minnesota open meeting law (Minn. Stat. § 471.705),[3] the Minnesota government data practices act (Minn. Stat. ch. 13),[4] and audit by the State Auditor.[5] The League is defined as a political subdivision in Minn. Stat. § 10A.01, subds. 26 and 27 and also Minn. Stat. §§ 471.992 to

---

[1] *See* Minn. Stat. § 645.08(1).
[2] *See also U.S. v. Callihan,* 666 F.2d 422, 424 (9th Cir. 1982) ("credit card" means small, flat tablet upon which account number is printed, but does not mean the number alone).
[3] *See* Minn. Stat. § 128C.22.
[4] *See* Minn. Stat. § 128C.17.
[5] *See* Minn. Stat. § 128C.12.

471.999 for the purposes of comparable worth reporting.[6] There is, however, no general pronouncement that the League is subject to other general laws applicable to the activity of government entities.

## QUESTION III

Is the League a "political subdivision" or otherwise subject to all laws governing the school districts that created it? Specifically, is the League subject to the uniform municipal contracting law set forth in Minn. Stat. § 471.345 or the public investing law set forth in Minn. Stat. §§ 118A.04 and 118A.05?

## OPINION

Except as to application of Minn. Stat. § 471.345 we answer your question in the negative.

The League does not itself constitute a "political subdivision" as that term is normally understood. *See e.g., Winberg v. University of Minnesota,* 499 N.W.2d 799 (Minn. 1993) (political subdivision is an entity empowered to levy taxes or cause taxes to be levied, with authority for subordinate local government).

The exact nature of the League as it has evolved is, however, quite ambiguous. It is generally identified as: "A nonprofit corporation that is a voluntary association of high schools." Minn. Stat. § 128C.01. Its membership includes both public and private schools. To the extent that the League is recognized as a bona fide separate corporation it would not normally be considered subject to laws limited in application to units of government, notwithstanding governmental membership and support, unless it is specifically made subject thereto. *See e.g.,* ●ps. Atty. Gen. 92a-30, January 29, 1986 (nonprofit corporation formed by counties to provide mental health services not subject to open meeting law).

As you have noted, the League is also, for certain limited purposes, included within the definitions of the terms "metropolitan governmental unit" (Minn. Stat. § 10A.01, subd. 26); "political subdivision" (Minn. Stat. §§ 10A.01, subd. 27 and 128C.15, subd. 3), and "state

---

[6] *See* Minn. Stat. § 128C.15.

agency" (Minn. Stat. § 128C.22). We are not aware, however, of any statute that makes the League subject to all laws applicable to any particular type of government entity.

The uniform municipal contracting law, Minn. Stat. § 471.345 applies to "any county, town, school district or other municipal corporation or political subdivision of the state . . . ." *Id.,* subd. 1. Minn. Stat. ch. 118A dealing with deposit and investment of local public funds applies to funds held or administered by "a county, city, town, school district, hospital district, public authority, public corporation, public commission, special district [or] any other political subdivision . . . ." Minn. Stat. § 118A.01, subd. 2. As noted above, the League as a "nonprofit corporation" does not generally fit within these categories of governmental units. Nor are we aware of any statute that specifically makes the laws governing deposit and investment of local public funds applicable to the League. Beginning with "the 1999-2000 school year", however, the League will be required to follow the requirements of Minn. Stat. § 123B.52 and 471.345 in purchasing goods and services. *See* Act of May 25, 1999, ch. 241 art. 9 §§ 38, 55, 1999 Minn. Laws 1920, 2041; 2050.[7]

## FACTS

The League's board of directors has various subcommittees, including an executive committee, a finance committee, and a committee-of-the-whole. Pursuant to Minn. Stat. § 128C.22, the League is subject to the open meeting law. The League's subcommittees should notice and hold open to the public all of their meetings.

## QUESTION IV

Are these subcommittees required to keep meeting minutes?

---

[7] The exact date of constituting the beginning of the 1999-2000 "school year" for purposes of the effective date of this section is not specified. Nor or we aware of a specific date that necessarily constitutes the beginning of the school year in all districts. However, inasmuch as Labor Day, September 6 is the earliest date upon which the 1999-2000 school year is permitted to begin (*See* Minn. Stat. Ann. § 120A.40 (1999 Supp.)), that is likely the date upon which section 38 was intended to take effect.

## OPINION

It seems clear that such committees or, as you have termed them, subcommittees, are required to maintain some form of minutes to the extent that they have been delegated any authority of the board of directors. As noted above, the League is defined by Minn. Stat. § 128C.01, subd. 1 as a nonprofit corporation. Pursuant to Minn. Stat. § 317A.461, subd. 1, a nonprofit corporation is required to maintain, *inter alia,* "minutes of meetings of . . . committees having any of the authority of the board of directors for six years." Furthermore as you note, the League is subject to Minn. Stat. § 471.705 (the open meeting law). *See* Minn. Stat. § 128C.22. The open meeting law provides in part:

> Except as otherwise expressly provided by statute, all meetings, including executive sessions, of any state agency, board, commission or department when required or permitted by law to transact public business in a meeting and the governing body of any school district however organized, unorganized territory, county, city, town, or other public body, and of any *committee, subcommittee,* board, department or commission thereof, shall be open to the public, except meetings of the commissioner of corrections. The votes of the members of such state agency, board, commission or department or of such governing body, committee, subcommittee, board, department or commission on any action taken in a meeting herein required to be open to the public shall be recorded in a journal kept for that purpose. which journal shall be open to the public during all normal business hours where such records are kept.

(Emphasis added.) Thus the votes of members of committees or subcommittees of the League are required to be recorded. It seems clear that, to be meaningful, such a record must also include the substance of the matter being voted upon.

The scope of the open meeting law's application to committees and subcommittees of covered bodies is somewhat ambiguous, however, in light of statements made in certain Minnesota court decisions. In *Minnesota Daily v. University of Minnesota,* 432 N.W.2d 189 (Minn. 1988) the Minnesota Supreme Court concluded that the open meeting law did not apply to the University's Presidential Search Advisory Committee. The court determined that the committee could not be considered a committee of the University's Board of Regents because its

membership was not chosen by the Regents and did not actually contain any Regents. However, the court went on to indicate that the committee was only empowered to review applications and make recommendations to the Board of Regents. This inability of the committee to actually "transact business" on behalf of the Regents was identified by the court as another reason not to apply the open meeting law to the Presidential Search Advisory Committee.

In *Sovereign v. Dunn,* 498 N.W.2d 62 (Minn. Ct. App. 1993), the Minnesota Court of Appeals held the open meeting law inapplicable to discussions among two members of the Lake Elmo City Council and certain representatives from the City of Oakdale concerning municipal boundary disputes. The court noted that the two council members were not formally appointed by the council to act as a committee of the Lake Elmo Council. Their "delegation" was created informally without any council vote and they were given no "powers." The court, however, also stated that the informal group would not be covered by the open meeting law because it was not "capable of exercising decision-making power of the governing body." *Id.* at 67.

It is not clear whether these decisions were intended to preclude application of the open meeting law to all "committees" that lack power to take final action on behalf of the governing body, or only to those investigatory or advisory groups that are not formally established by the governing body and do not include governing body members. However, in our view the plain meaning of the terms "committee" and subcommittee would include all formally established subsets of the parent body officially delegated to perform a function, including fact gathering, reporting or recommending action as well as taking action on behalf of the parent body. *See e.g., The American Heritage College Dictionary* (Third Edition, 1997) ("a group of people officially delegated to perform a function").

In any event, it is clear that any committees exercising any of the powers of the League's board of directors are required to keep certain minutes. We believe that any committee formally established by the board, composed of board members and carrying out any defined mission

delegated by the board, should likewise maintain a record of members' votes pursuant to Minn. Stat. § 471.705.

## QUESTION V

Is there any legal restriction on the League's ability to give free tickets to employees, board members, past board members, or other groups or individuals designated by the board?

## OPINION

This question raises several issues concerning the giving or acceptance of "gifts" by various individuals. First, it is important to recognize that the League is considered a lobbyist principal. A lobbyist "principal" means an individual or association that:

(1) spends more than $500 in the aggregate in any calendar year to engage a lobbyist, compensate a lobbyist, or authorize the expenditure of money by a lobbyist; or

(2) is not included in clause (1) and spends a total of at least $50,000 in any calendar year on efforts to influence legislative action, administrative action, or the official action of metropolitan governmental units, as described in section 10A.04, subd. 6.

Minn. Stat. § 10A.01, subd. 28 (1998). According to the records of the Minnesota Campaign Finance and Public Disclosure Board, the League is a lobbyist principal. As such the League is generally prohibited by Minn. Stat. § 10A.071 from giving a gift to a public official,[8] employee of the legislature, or local official of a metropolitan government unit.[9] Providing free tickets to athletic events would generally constitute a gift of entertainment.[10] Thus, they could not be given to the officials described in section 10A.071 unless the gift would come within one of the exceptions contained in subdivision 3 of that section. While none of those exceptions would

---

[8] A "public official" for purposes of Minn. Stat. ch. 10A is defined by Minn. Stat. § 10A.01 subd. 18.

[9] See definitions at Minn. Stat. § 10A.01, subd. 25-26.

[10] See Minn. R. 4512.0100, subp. 3. Opinion of the Campaign Finance and Public Disclosure Board, No. 287, January 23, 1998.

appear to apply in most cases, it is possible that the one set forth in subdivision 3(b)(1) (membership in a group) could apply in some circumstances.

It is possible that board members and certain League employees would be considered "officials" in their capacity at the League. The definition of "official" includes officials of "metropolitan governmental units." The definition of "metropolitan governmental unit" for purposes of chapter 10A. includes the Minnesota State High School League. Minn. Stat. § 10A.01, subd. 26 (1998). However, despite the extreme breadth of section 10A.071 prohibitions, it does not seem reasonable to suppose that the legislature intended, by that section, to prohibit a lobbyist principal from providing gifts to its own officers and employees, *per se*. Nonetheless it would seem prudent for the League to avoid providing free tickets to its officers and employees for purposes of their personal entertainment.

It is also possible that League officials, together with other possible recipients, could be considered local officials pursuant to another gift ban set forth in section 471.895, subd. 2 which provides:

> An interested person may not give a gift or request another to give a gift to a local official. A local official may not accept a gift from an interested person.

Under Minn. Stat. § 471.895, subd. 1(d), "local official" means an "elected or appointed official of a county or city or of an agency, authority, or instrumentality of a county or city." "'Interested' person means a person or a representative of a person or association that has a direct financial interest in a decision that a local official is authorized to make." *Id.*, subd. 1(c). While the League would seem clearly to have a financial interest in decisions made by officials of school districts, they are not included within the scope of the prohibition as defined above. We are not aware of specific financial interests the League may have in the decisions of other local officials, although it is clearly possible that they may exist, *e.g.*, decisions concerning availability and charges for League use of a city or county-owned facility. In such circumstances we believe that gifts of tickets to such local officials would be prohibited.

Our office has consistently held that government agencies may not provide, absent express statutory authority, gratuities or grants to private organizations or persons, including employees. *See e.g.,* Ops. Atty. Gen. 107a-3, January 22, 1980 (gratuitous employee bonuses); 476-B-2, May 11, 1949 (gift to veterans' organizations); 476-B-2, October 11, 1946 (donations to Red Cross or Boy Scouts). As noted above, however, the status of the League is quite ambiguous and, absent a specific statute, would not likely be bound by the legal limitations imposed upon the governmental agencies. Rather, it would more likely be treated for this purpose as a nonprofit corporation. In that regard the League should consider its constitution and bylaws to determine whether such gifts would be authorized. We note, however, that Minn. Stat. § 128C.10, subd. 3, in providing an expense account for the League's executive director to be used, among other things, "to entertain guests of the League," does suggest that some form of League-provided gratuitous entertainment is contemplated by the legislature.

## FACTS

The League is a statewide organization. Once a year the board has a three-day retreat in which it holds workshops and a formal board meeting. This retreat has been held at a facility that includes a golf course. Daily golf fees are included in the cost of the rooms. Board members do not pay room charges directly, but instead the room charges are billed to the League.

## QUESTION VI

Is the League permitted to pay for expenses associated with such a retreat including the room charges which incorporate golf "fees?"

## OPINION

In general, hosting retreats and conferences for its officers and employees are considered authorized activities of government agencies and private organizations. *Cf. St. Cloud Newspapers Inc., v. District 742 Community Schools,* 332 N.W.2d 1 (Minn. 1983) (out-of-town conference by school board subject to open meeting law). As such, the League would generally

be permitted to pay for the reasonable expenses associated with such activities. Board members and employees are expressly authorized to be reimbursed expenses as authorized by the Commissioner's Plan adopted pursuant to Minn. Stat. § 43A.18, subd. 2. *See* Minn. Stat. §§ 15.0575, subd. 3; 128C.01, subd. 4; 128C.10.

While that plan authorizes payment of reasonable lodging expenses,[11] it would not generally allow for payment of personal recreational expenses such as golfing. However, availability of recreational facilities such as swimming pools, exercise equipment, tennis courts and golf courses to paying guests would not, in our view, render all or part of the costs of the rooms, *per se*, non-reimbursable. Such a determination would need to be made upon additional facts not provided; for example, whether the availability of the recreational facilities are necessarily included in the room charges and whether or not their availability is the principle reason for selecting the facility for the conference.

Best regards,

MIKE HATCH
Attorney General
State of Minnesota

KENNETH E. RASCHKE, JR.
Assistant Attorney General

AG:79029, v. .0

---

[11] *See Commissioner's Plan*, July 1, 1997 through June 30, 1999 (Minn. Dept. of Employee Rel.) Ch. 15.