**TROUT UNLIMITED, INC.,
et al., Appellants,**

v.

**The MINNESOTA DEPARTMENT OF
AGRICULTURE, Respondent.**

No. C3–94–1900.

Court of Appeals of Minnesota.

March 7, 1995.

Review Denied April 27, 1995.

904

Nicholas J. Spaeth, Steven M. Christenson, Dorsey & Whitney, Fargo, ND, for appellants.

Hubert H. Humphrey, III, Atty. Gen., Paul A. Strandberg, Asst. Atty. Gen., St. Paul, for respondent.

Considered and decided by DAVIES, P.J., and HUSPENI and FOLEY,* JJ.

## OPINION

HUSPENI, Judge.

After reviewing an Environmental Assessment Worksheet (EAW) and comments responding thereto, the Commissioner of Agriculture (Commissioner) decided that an Environmental Impact Statement (EIS) was not required for a proposed irrigation project bordering Dead Horse Creek, a trout stream in Becker County.

Appellants Trout Unlimited, Inc. and the Osage Environmental Society filed an action in district court, seeking a declaratory judgment that an EIS was required for the irrigation project. The district court issued an order for summary judgment, concluding that the Commissioner had acted within his discretion when determining that there was

no need for an EIS. Because we conclude that the Commissioner erred by failing to consider several comments received during the comment period, by failing to consider the potential cumulative effects of the project, and by relying on future permitting or monitoring efforts to control or redress potential problems, we reverse and remand to the Commissioner for preparation of an EIS.

## FACTS

In early 1993, Triple J Farms applied for a water appropriation permit to irrigate approximately 140 acres of grass/brush land in Becker County, Minnesota. Triple J's proposed irrigation project is located on two sides of Dead Horse Creek, a trout stream. Regulations promulgated by the Minnesota Pollution Control Agency (PCA) provide that water taken from trout streams, if disinfected by approved methods such as simple chlorination, must meet the United States Health Department's drinking water standards.[1]

The land on both sides of Dead Horse Creek is very steep, particularly in portions of the ravine. Because of the steep slopes and coarse soil along the stream, a concern arose that the proposed irrigation could erode the stream banks, resulting in significant degradation. Interested citizens petitioned for environmental review of the irrigation project. The Minnesota Department of Natural Resources (DNR) and Minnesota Department of Agriculture (MDA) prepared an EAW for the proposed project. Initially, the DNR was designated as the responsible governmental unit for the environment review process, but in June 1993, the MDA was substituted as the responsible governmental unit.

The EAW raised several concerns, including "a significant potential for erosion," that would "not likely * * * be mitigable," and a "high potential for nitrate leaching under poorly-managed irrigated crops," requiring appropriate irrigation and nitrogen best management practices to reduce the potential impacts. The EAW also expressed a

---

\* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to Minn. Const. art. VI, § 10.

1. Minn.R. 7050.0420, 7050.0220, subp. 2B (1993).

concern that the clay layers separating the local aquifers could leak and allow movement of water between aquifer levels, which could result in the reduction of water flow in the trout stream during the late summer. The EAW also noted that future stages of Triple J's development were planned or likely. The EAW concluded that the current lack of information, the sensitive features of the site, and the high probability for adverse significant impacts to the trout stream required additional assessment and monitoring. The EAW also expressed a concern that any damages may not be mitigable, risking the state's prior investment in the stream as a trout habitat.

The EAW noted that the Becker County Soil and Water Conservation District (Conservation District) had approved a Conservation Plan for the proposed irrigation project, providing for a system of waterways, tillage residue requirements, and a 100–foot buffer strip between the crops and the stream. The EAW concluded, however, that the Conservation Plan required further modification, and that additional information was necessary to assess the level of projected erosion as a result of the irrigation project.

The EAW generated numerous comments from private citizens, organizations, and agencies. The DNR commented that insufficient information was currently available to make a recommendation on the need for an EIS. The DNR indicated that additional information was necessary concerning expected runoff of nutrients and pesticides to be applied during the irrigation process, the potential for erosion, future plans for farming and irrigation in the area, and plans for monitoring and enforcement.

The Department of Health expressed "serious concerns" with the proposed irrigation project, noting that it appeared to have "the potential for contamination of groundwater and surface water, with resultant negative impacts on drinking water and public health." Specifically, the Department of Health expressed concerns about erosion, fertilizer and pesticide leaching to groundwater, plans for future expansion or independent developments in the area, and a lack of monitoring plans.

The PCA also expressed concern about the lack of data in "several key areas," including nitrate runoff, erosion, and the possible existence of a subsurface connection between the source aquifer and the trout stream that could have "significant ramifications for creek water levels and temperatures." The PCA concluded that "the case for an EIS is compelling."

The comment period was extended[2] and the Conservation Plan was modified. The modified plan reduced the size of the project from 140 to 97 acres, and provided that, instead of a 100–foot buffer strip along the stream, as originally proposed, Triple J would keep 26 acres along the stream planted in alfalfa/hay, with small grain crops rotating every fourth year as a nurse crop for the alfalfa.

Nevertheless, the Department of Health, DNR, and PCA continued to express concern with the proposed irrigation project. The Department of Health stressed that additional information was necessary on the types and quantities of pesticides to be applied through irrigation and the plans of nearby landowners or Triple J for future similar projects.

The DNR recommended an EIS because the proposed irrigation project presented a "potential for significant environmental effects." The DNR indicated that there were risks of stream degradation that could occur before the DNR or MDA would have a chance to intercede. The DNR concluded that an EIS should address the potential for leachate discharge and migration, runoff impacts, and the potential for success of any proposed mitigation, including enforcement.

A memorandum from the PCA indicated a view that "significant environmental degradation would result" if the irrigation project were implemented. The PCA continued to recommend an EIS to explore further issues relating to thickness and permeability of the aquifers, potential ground water contamination from nitrate increases in the aquifers,

---

**2.** Minn.R. 4410.1700 (1993) authorizes a responsible governmental unit to postpone a decision on the need for an EIS for up to 30 days in order to obtain additional information.

slope failure, sediment and nutrient erosion, and the effectiveness of the proposed buffer strips.

Despite the above concerns expressed by the DNR, PCA, and Department of Health, the Commissioner issued an order determining that the EAW had generated sufficient information to determine whether an EIS was necessary. The Commissioner concluded that an EIS was unnecessary because the proposed irrigation project did not have a potential for significant environmental effects. The Commissioner specifically noted: "Areas where potential environmental effects have been identified have been addressed by appropriate mitigative measures incorporated into the project design or are subject to mitigation by ongoing public regulatory authority." Appellants brought a declaratory judgment action in district court. The court concluded that the MDA acted within its discretion in determining that there is no need for an EIS for the proposed irrigation project.

## ISSUES

1. Did the Commissioner err by failing to consider all of the comments generated by the EAW?

2. Did the Commissioner err by failing to consider the potential cumulative effects of similar projects in the area?

3. Did the Commissioner err by failing to consider the potential impacts of chemigation and/or fertigation on the trout stream?

## ANALYSIS

### Scope and standard of review

The district court limited its review to the record before the Commissioner, thereby functioning in an appellate, rather than a de novo, capacity. Accordingly, we must

> make an independent examination of [the] administrative agency's record and decision and arrive at our own conclusions as to the propriety of that determination without according any special deference to the same review conducted by the trial court.

*Reserve Mining Co. v. Herbst,* 256 N.W.2d 808, 824 (Minn.1977).

■ We review the Commissioner's decision to determine whether it is unreasonable, arbitrary, or capricious. *See Carl Bolander & Sons Co. v. City of Minneapolis,* 502 N.W.2d 203, 207 (Minn.1993) (citing *Swanson v. City of Bloomington,* 421 N.W.2d 307, 313 (Minn.1988)). An agency's decision is arbitrary or capricious if "it represents the agency's will, rather than its judgment." *Mammenga v. Department of Human Servs.,* 442 N.W.2d 786, 789 (Minn.1989) (citing *Markwardt v. State Water Resources Bd.,* 254 N.W.2d 371, 374 (Minn.1977)). A decision will be deemed arbitrary and capricious if the agency relied on factors which the legislature had not intended it to consider, if it entirely failed to consider an important aspect of the problem, if it offered an explanation for the decision that runs counter to the evidence, or if the decision is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Motor Vehicle Manufacturers Assoc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983).

### I.

### Extent of the record

Appellants have appended to their brief certain documents obtained from the MDA's records. The Commissioner claims that he did not consider these documents, but based his decision solely upon the Conservation Plan, the EAW, and the comments specifically addressed in his order. The Commissioner admits, however, that the documents appended to appellants' brief were available to him when he was considering the need for an EIS.

■ A responsible governmental unit's decision on the need for an EIS must be based on "the environmental assessment worksheet and the comments received during the comment period." Minn.Stat. § 116D.04, subd. 2a(b) (1992). The Commissioner argues that this language restricts the Commissioner to considering only the EAW and responses labeled "comments." We disagree, and de-

cline to read the statute as narrowly as the Commissioner urges. If the disputed documents were available and in the possession of the MDA, they are part of the record as defined by the statute, and should have been considered by the Commissioner when determining whether an EIS was necessary.

## II.

### Cumulative effects of future projects

■ An EIS must be prepared for projects that have a "potential for significant environmental effects." Minn.Stat. § 116D.04, subd. 2a (1992). A responsible governmental unit should consider several criteria when deciding whether an EIS must be prepared. One of these factors is the "cumulative potential effects of related or anticipated future projects." Minn.R. 4410.1700, subp. 7B (1993). In addition, "[c]onnected actions and phased actions shall be considered a single project for purposes of the determination of need for an EIS." *Id.*, subp. 9.

The Commissioner concluded:

Any potential impacts associated with possible future expansion of irrigation of cropland cannot be inferred from this project, nor can it be inferred that this project will significantly stimulate additional development of irrigated cropland. Since private decisions on whether to irrigate cropland involve individual financial, physical and environmental circumstances, one project is unlikely to have a significant effect on decisions on other projects in the area or the state.

■ In light of the record in this case, we conclude the above determination is arbitrary. The EAW itself stated that future stages of irrigation projects in the area were "planned or likely." A memorandum from the PCA stated that a nearby landowner had three or four parcels of land that he hoped to convert to irrigate and farm, pending the outcome of the Triple J permit. This land was approximately one mile upstream from Triple J and adjacent to Dead Horse Creek.

Letters from the DNR and Department of Health suggested that it would be impossible to determine the potential for significant en-

vironmental effects associated with the irrigation project without determining the extent of future plans for farming and irrigation in the area. In fact, the MDA itself stated in a letter to Triple J that the Department of Health believed additional information was necessary on "the plans of nearby landowners in terms of similar farming operations."

## III.

### Potential impact of chemigation and fertigation

■ When considering whether to require an EIS, a responsible governmental unit must consider the "type, extent, and reversibility of environmental effects" and "the extent to which the environmental effects are subject to mitigation by ongoing public regulatory authority." Minn.R. 4410.1700, subp. 7A, C. "Mitigation" includes avoiding or limiting the size of a project, repairing or restoring the environment, working to preserve or maintain the environment during the life of the project, or replacing or substituting resources. Minn.R. 4410.0200, subp. 51 (1993).

The EAW noted that chemicals could impact Dead Horse Creek in several ways, including:

[i]ncreased movement of pesticides to surface water that stem from aerial or irrigation applied drift, increased pesticide application with the change in crops, pesticide adsorption to particles susceptible to erosional transport, and pesticides leaching to ground water that then could be transported to the stream.

The DNR, Department of Health, and PCA also expressed grave concerns that chemicals applied through the irrigation project could result in a potential for significant environmental effects.

The DNR notified the Commissioner that the likely impacts of herbicides, insecticides, and fungicides on the stream required assessment, and that it was impossible to determine the potential for significant environmental effects without determining the extent of the expected chemical input. The Department of Health also informed the

Commissioner that information regarding the types and quantities of pesticides, herbicides, and fertilizers was needed before issuing a permit, and that such information could be part of an EIS. The PCA also expressed a concern with the potential for chemical movement into the stream.

The MDA itself noted in a letter to Triple J that several questions needed to be answered before a decision could be made on an EIS, including "What types and extent of chemical inputs are expected to be used in this farming operation?" and "What measures will be taken to protect Dead Horse Creek from chemical or nutrient inputs associated with the proposed farming activity?"

The Commissioner, having before him a record containing the concerns highlighted in the EAW and expressed by the DNR, Department of Health and the PCA, recognized that "the potential for nitrate leaching through the upper aquifers into Dead Horse Creek is a major concern with respect to the proposed project." The Commissioner also recognized that Triple J would need a chemigation permit to apply any pesticides through the irrigation system and a fertilizer chemigation permit to apply fertilizers through the irrigation system. The Commissioner ultimately concluded, however, that: "Monitoring and permit conditions can identify significant impacts and modify or terminate the project if necessary."

Our review of the record and the applicable statutes convinces us that this conclusion cannot be sustained. Under the Commissioner's analysis, the irrigation project would go forward without an EIS and in the event significant environmental effects did occur, the Commissioner would then rely on monitoring or restrictive permitting procedures to reduce or eliminate those deleterious effects. The very purpose of an EIS, however, is to determine the potential for significant environmental effects *before* they occur. By deferring this issue to later permitting and monitoring decisions, the Commissioner abandoned his duty to require an EIS where there exists a "potential for significant environmental effects." Minn.Stat. § 116D.04, subd. 2a. The potential impacts of chemicals should be analyzed during the EIS process,

rather than waiting until Triple J has expended time and effort on its irrigation and farming operations only to face the risk of later restriction or withdrawal of its permits.

Finally, the Commissioner erred by confining the environmental review process to the EAW, in derogation of the more extensive analysis contemplated by an EIS. The EAW is only a "brief document which is designed to set out the basic facts necessary to determine whether an environmental impact statement is required for a proposed action." Minn.Stat. § 116D.04, subd. 1a(c) (1992). *See Bolander*, 502 N.W.2d at 207 (EAW process is designed to discover whether a project may harm the environment, while EIS is "more extensive"). When an EAW has indicated, as here, that a project may harm the environment, use of that indication to conclude that an EIS is unnecessary, "makes a mockery of the EAW as a decisionmaking tool." John H. Herman and Charles K. Dayton, *Environmental Review: An Unfulfilled Promise* Bench and Bar, July 1990 at 31, 36. The record in this case exemplifies the need for careful evaluation of and differentiation between the purpose served by an EAW and that served by an EIS. The record also supports but one conclusion: in this case an EIS must be prepared.

### DECISION

As the Environmental Assessment Worksheet revealed, Triple J's proposed irrigation project poses a potential for significant environmental effects. We therefore reverse and remand to the Commissioner for preparation of an Environmental Impact Statement.

**Reversed and remanded.**