**POPE COUNTY MOTHERS,**
**et al., Respondent,**

v.

**MINNESOTA POLLUTION CONTROL**
**AGENCY, Respondent,**

Hancock Pro–Pork, Inc., Intervenor,
Appellant.

No. CX–98–2308.

Court of Appeals of Minnesota.

May 25, 1999.

James Pierce Peters, Peters & Peters, PLC, Glenwood, for respondent Pope County Mothers.

Michael M. Fluegel, Fluegel, Helseth, McLaughlin, Anderson and Brutlag, Chtd., Morris, for appellant Hancock Pro–Pork, Inc.

Mike Hatch, Attorney General, Richard P. Cool, Assistant Attorney General, St. Paul, for respondent Minnesota Pollution Control Agency.

Considered and decided by TOUSSAINT, Chief Judge, AMUNDSON, Judge, and HUSPENI, Judge.

## OPINION

HUSPENI, * Judge.

On appeal from summary judgment, appellant Hancock Pro–Pork, Inc. contends the district court erred in (1) determining that the Minnesota Pollution Control Agency's (MPCA) decision not to require an EIS for proposed feedlot project was arbitrary and capricious and (2) remanding the matter to the MPCA for preparation of an EIS. Because we concur with the district court that the MPCA's decision that an EIS was not needed was arbitrary and capricious, we affirm.

## FACTS

Appellant-intervenor Hancock Pro–Pork, Inc. (HPP) is a Minnesota corporation seeking to build and operate a multi-site farrow-to-finish feedlot that would supply feeder pigs to HPP shareholders, all of whom are family farm corporations or partnerships. Under its proposed plan, HPP would build a farrow/nursery facility in Stevens County and expand eight of fourteen finishing sites owned by individual HPP shareholders in Pope and Stevens Counties. HPP proposes to store manure waste in underground concrete pits that would be emptied annually and then apply the manure to crop land as fertilizer. Because the project represents an increase of 4,214 animal units, HPP submitted information to the MPCA for completion of a mandatory Environmental Assessment Worksheet (EAW).

The MPCA issued an EAW in August 1997. A 30–day public comment period followed. In the month preceding the EAW's issuance, the MPCA issued certificates of compliance to three of the eight finishing sites that HPP proposed to expand. A fourth finishing site, the Wrolson site, received an MPCA interim permit for expansion one day after the end of the 30–day public comment period.

On October 28, 1997, the MPCA Citizens Board held a public meeting to discuss whether the HPP project required an EIS. At the meeting's conclusion, the Board approved the recommendation of MPCA staff for a negative declaration on the need for an EIS. Respondents Pope County Mothers and Others Concerned for Health and Peters Sunset Beach, Inc., challenged the negative declaration in district court, moving for a declaratory judgment that an EIS was required for the HPP project. The district court found the MPCA's decision arbitrary and capricious and ordered preparation of an EIS. HPP now appeals. The MPCA did not file a brief on appeal.

## ISSUE

Was the MPCA's determination that the HPP multi-site feedlot operation did not have the potential for significant environmental effects and resulting negative dec-

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to      Minn. Const. art. VI, § 10.

laration on the need for an EIS arbitrary and capricious?

## ANALYSIS

■ On appeal from a summary judgment reversing an agency decision, we review the agency decision de novo to determine if it is unreasonable, arbitrary or capricious. *See Iron Rangers for Responsible Ridge Action v. Iron Range Resources*, 531 N.W.2d 874, 879 (Minn.App. 1995) (reviewing the administrative record for substantial evidence supporting the agency determination), *review denied* (Minn. July 28, 1995). An agency's decision is arbitrary or capricious if the agency relied on factors the legislature never intended it to consider, if it entirely failed to consider an important aspect of the problem, if it offered an explanation for the decision that runs counter to the evidence, or if the decision is so implausible that it could not be ascribed to a difference in view or the result of agency expertise. *Trout Unlimited, Inc. v. Minnesota Dep't of Agric.*, 528 N.W.2d 903, 907 (Minn.App. 1995), *review denied* (Minn. Apr. 27, 1995). If the agency's decision represents its will, rather than its judgment, the decision is arbitrary and capricious. *Id.* A reviewing court will intervene only where there is a "combination of danger signals [that] suggest the agency has not taken a 'hard look' at the salient problems and 'has not genuinely engaged in reasoned decision-making.'" *Reserve Mining Co. v. Herbst*, 256 N.W.2d 808, 825 (Minn.1977) (quoting *Greater Boston Television Corp. v. F.C.C.*, 444 F.2d 841, 851 (D.C.Cir.1970)).

An agency must prepare an EIS "where there is potential for significant environmental effects." Minn.Stat. § 116D.04, subd. 2a (1998). The criteria for determining the potential for significant environmental effects are the type, extent, and reversibility of environmental effects; the cumulative potential effects of related or anticipated future projects; the extent to which environmental effects are subject to mitigation on ongoing public regulatory authority; and the extent to which environmental effects can be anticipated and controlled as a result of other available environmental studies. Minn. R. 4410.1700, subpt. 7 (1997). "Connected actions and phased actions shall be considered a single project for purposes of the determination of need for an EIS." *Id.*, subpt. 9 (1997). This latter rule has special significance under the facts of this case.

■ The MPCA determined, and HPP does not contest, that the farrow facility and finishing sites are connected and must be considered one project when determining the need for an EIS. In arguing that the MPCA's negative declaration was arbitrary and capricious, respondents emphasize the MPCA's issuance of permits to three HPP finishing sites prior to completion of environmental review of the entire HPP project. The three sites at issue— the Greiner site, the Solvie site, and the Wrolson site—are located in Pope County, where the MPCA is responsible for issuing feedlot permits.[1] HPP characterizes the early issuance of permits for these three sites as "innocent administrative error" that does not fall within the four criteria for arbitrariness or capriciousness.

According to the administrative record, the MPCA did not receive HPP materials that clearly identified the Greiner, Solvie,

---

1. In addition to these three sites, Stevens County (the delegated permitting authority) issued the Nohl finishing site a permit for a finisher barn. The administrative record contains a May 19, 1997 letter to Mr. Nohl approving construction of the finisher barn before completion of the HPP environmental review on the understanding that Mr. Nohl would be obtaining feeder pigs as an independent operator, the Hancock project was still uncertain, and the barn construction contract was signed before the Hancock group was organized. The letter clearly acknowledges, however, that it would be problematic if the barn were constructed for the sole purpose of serving as a Hancock finishing site because the Hancock EAW must "evaluate the complete project (which includes your finishing site)."

and Wrolson farms as finishing sites until June 30, 1997, after it had already issued the Greiner and Solvie permits. The August 7, 1997 EAW records the expansion at the Greiner site as "permitted." Thus, the MPCA was aware that it had already issued the Greiner permit to an HPP finishing site. Yet, in an earlier June 5, 1997 letter denying a permit to another HPP finishing site, the MPCA acknowledged that permits could not be issued to finishing sites before environmental review of the entire project was completed:

> Your finishing barn is a part of [the Hancock] project. Other things being equal, then, your project would be subject to the Hancock environmental review requirement, and by law could not be permitted or started until that environmental review process is completed. The law is clear that, when a project requires environmental review, as Hancock does, the *entire project* must be evaluated. The law is explicit that large projects (such as the Hancock project) must not be broken up into smaller units in order to avoid environmental review.

Despite this acknowledgment, the MPCA did not rescind or otherwise take corrective action with respect to the Greiner permit. Moreover, the MPCA proceeded to issue a permit to the Wrolson finishing site on September 11, 1997, one day after the end of the public comment period. We conclude that these permit decisions went beyond mere administrative error to indicate that the MPCA was exercising its "will, rather than its judgment" in determining that the project could go forward without an EIS.

Our review of the administrative record also reveals that the MPCA failed to consider the cumulative environmental effects of the finishing sites. The rules governing environmental review recognize that "cumulative impacts can result from individually minor but collectively significant projects taking place over a period of time." Minn. R. 4410.0200, subpt. 11 (1997) (defining cumulative impact as "the impact on the environment that results from incremental effects of the project in addition to other past, present, and reasonably foreseeable future projects regardless of what person undertakes the other projects."). Where, as here, multiple individual sites are considered a single project, careful assessment of their cumulative environmental effects is critical if the EAW is "to set out the basic facts necessary to determine whether an [EIS] is required for a proposed action." Minn.Stat. § 116D.04, subd. 1a(c) (1998). At the MPCA Board meeting, an MPCA representative admitted that the HPP EAW is "the first one [with] this galaxy of finishing sites surrounding a farrowing and nursery site." We note from the EAW that the environmental effects from animal unit (AU) increases are largely attributable to the finishing sites: the net AU increase at finishing sites is 3,150, bringing the project's total AU increase to 4,134. Under these circumstances, the MPCA did not engage in reasoned decisionmaking when it failed to consider the cumulative environmental effects of the finishing sites.

The MPCA similarly ignored the potential for significant environmental effects arising from hydrogen sulfide (H2S) emissions. Although the MPCA expresses concern in the EAW about the emission of hydrogen sulfide gases from larger feedlot operations, it stated it would rely on modeling "to predict the level of air pollutant emissions from the facility" and monitoring during the permit process rather than preparation of an EIS. In *Trout*, this court concluded that a similar response to a stated concern regarding the potential for nitrate leaching was arbitrary and capricious. *Trout*, 528 N.W.2d at 909. The court stated that deferring the issue to later permitting and monitoring was an abandonment of the agency's duty to require an EIS where a potential for significant environmental effects exist. *Id.* (reasoning that very purpose of environmental assessment is to determine potential for

significant environmental effects *before* they occur).

■ HPP argues that *Trout* is inapplicable because to the extent adverse environmental effects can be mitigated in the regulatory process, they are not deemed "significant." The extent to which environmental effects are subject to mitigation is an important consideration when determining whether a project has the potential for significant environmental effects. Minn. R. 4410.1700, subpt. 7C. Nevertheless, the MPCA must still consider the extent of the environmental effects likely to result and how those effects could be mitigated. *White v. Minnesota Dep't of Natural Resources*, 567 N.W.2d 724, 731 (Minn.App.1997) (concluding that EAW that "extensively addresses the extent to which identified environmental effects can be mitigated" complies with *Trout* ), *review denied* (Minn. Oct. 31, 1997). The HPP EAW does not even mention mitigation. The MPCA response to public comments expressing concern about feedlot air emissions bypasses any discussion on the potential for significant environmental effects or how they can be mitigated:

> Modeling will be required to be completed before the permit is issued. If necessary, this applicant would be required to control emissions to minimize the potential for impacts.

The MPCA's response and decision not to require an EIS is troubling when, in answer to another public comment on air emissions, it states: "the staff believes that the increasing size of feedlots means that the potential is there for higher levels of problematic gases in the environment, and that this potential cannot be ignored."

HPP argues that the MPCA was not ignoring this potential when it did not require modeling before the negative declaration. It argues that the MPCA determined that modeling was still too new to accurately assess feedlot air emissions in the EAW. At the MPCA Board meeting, one MPCA representative described H2S emission modeling as "a brand new wrinkle" and explained that modeling was not required for the HPP EAW because the EAW process was well under way before the agency "got seriously into modeling in feedlots." The representative stated that in the future, the MPCA will likely require modeling before the EAW goes up for public notice and the EAW will contain the modeling results. The same representative later acknowledged, however, that the MPCA was asking new permit applicants to use modeling software that became available within the past year because the modeling can be accomplished "in a relatively short time for relatively low cost." He reiterated that they were doing it "after the fact" for the HPP project because the technology was recent, but admitted that modeling had already been required for one other project to date.

■ These comments suggest that the MPCA's determination that H2S emissions had no potential for significant environmental effects was premature and based on inadequate information. The agency concedes that the EAW should contain modeling results and that those results can be obtained quickly and inexpensively. If the agency determines that information necessary to a reasoned decision about the potential for, or significance of, one or more possible environmental impacts is lacking, but could be reasonably obtained, the agency shall either (1) make a positive declaration and include within the scope of the EIS appropriate studies to obtain the lacking information or (2) postpone the decision on the need for an EIS. Minn. R. 4410.1700, subpt. 2a (1997). The MPCA declined to exercise either of these options, which further indicates that the negative declaration represents the "agency's will, rather than its judgment."

■ HPP asks this court not to consider materials outside the administrative record in its de novo review of the agency's negative declaration. HPP and respondents specifically refer to a May 1998 MPCA report ("the Pratt report") on cu-

mulative air emissions from 60 feedlots, including all the feedlots in the HPP project. We do not and need not consider the Pratt report to determine that the MPCA's negative declaration on the need for an EIS was arbitrary and capricious.[2] The administrative record before us demonstrates that the MPCA did not genuinely engage in the reasoned decisionmaking the law requires.

## DECISION

The MPCA's negative declaration on the need for an EIS was arbitrary and capricious and the district court properly remanded the matter to the MPCA for preparation of an EIS.

**Affirmed.**

---

**2.** The district court did not exclude the Pratt report and it is part of the record on appeal. *See White,* 567 N.W.2d at 734 (determining that materials outside of the administrative record not excluded by the district court was part of the record on appeal). Recognizing that the Pratt report was outside the administrative record, the district court stated that the report concluded, on the basis of air dispersion modeling, that hydrogen sulfide emissions from multiple feedlots in Stevens and Pope Counties (including the HPP sites) "exceeded the state standard by a wide margin." A district court may consider evidence outside the administrative record only when: (1) the agency's failure to explain its action frustrates judicial review; (2) additional evidence is necessary to explain technical terms or complex subject matter; (3) the agency failed to consider information relevant to making its decision; or (4) plaintiffs make a showing that the MPCA acted in bad faith. *National Audubon Soc. v. MPCA,* 569 N.W.2d 211, 216 (Minn.App.1997), *review denied* (Minn. Dec. 16, 1997). Mindful of the possibility of the district court second-guessing the agency on the basis of additional evidence, "[t]he evidence introduced for the first time in the district court * * * would be probative only insofar as it tended to show either that the agency's research or analysis was clearly inadequate or * * * failed to set forth [widely shared scientific views]." *White,* 567 N.W.2d at 735 (quoting *County of Suffolk v. Secretary of the Interior,* 562 F.2d 1368, 1385 (2d. Cir. 1977)). In its 66–page amended order, the district court identified the *Audubon* factors and cited the Pratt report. We may properly infer that the district court determined that one of the *Audubon* factors was met. Regardless, we independently examine the agency decision and do not defer to the district court's decision regarding this extra-record evidence. *Id.* at 734. Moreover, on appeal, HPP does not challenge the district court's consideration of the Pratt report.