*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-1153
A13-1157**

Re:  Declaring a Negative Need for an
Environmental Impact Statement for the
Proposed Living Word Bible Camp Project.

**Filed July 21, 2014
Affirmed
Larkin, Judge**

Itasca County Board of Commissioners

G. Craig Howse, Jeffrey C. Thompson, Jacob R. Grassel, Howse & Thompson, P.A., Plymouth, Minnesota (for respondent Living Word Bible Camp)

Paul D. Reuvers, Iverson Reuvers Condon, Bloomington, Minnesota (for respondent Itasca County)

James P. Peters, James P. Peters PLLC, Glenwood, Minnesota (for relator Brown, et al.)

John H. Erickson, Erickson Law Offices, PLLC, Brainerd, Minnesota (for relator Newton)

Considered and decided by Larkin, Presiding Judge; Worke, Judge; and Stauber, Judge.

**U N P U B L I S H E D   O P I N I O N**

**LARKIN**, Judge

In these consolidated appeals, relators challenge respondent-county's issuance of a negative declaration on the need for an environmental-impact statement (EIS) regarding

respondent-organization's proposal to build a bible camp and retreat on Deer Lake in Itasca County. Because the county did not legally err in conducting its environmental review, and because the negative declaration is supported by substantial evidence, we affirm.

**FACTS**

*Nature of the proposed project*

In September 2000, respondent Living Word Bible Camp (LWBC) purchased approximately 253 acres of land on the eastern shore of Deer Lake, hoping to build and operate a summer bible camp and retreat center on the property. As proposed by LWBC, the camp will be clustered on 5.72 acres of the property. The project will include a lodge with a chapel, meeting space, commercial kitchen, and dining room; an activity building; an office building; five dormitory cabins; a storm shelter; a boathouse; a storage building; parking; a gazebo and trail system; an existing beach and dock; and one additional dock. The project is planned to accommodate a maximum overnight capacity of 150 people and will operate primarily as a youth camp during summer months, but the center may also host adult retreats during other months.

*Environmental concerns regarding the project*

From its inception, the LWBC project has prompted numerous environmental concerns. A predominant concern is the potential for disturbance of area wildlife, particularly in Kocemba Bay, which borders the northerly portion of LWBC's property and encompasses several islands that are part of the Balsam-Deer Islands Wildlife Management Area. Deer Lake is one of approximately 40 Minnesota Lakes with a

2

naturally reproducing and self-sustaining muskellunge population, and Kocemba Bay has been identified as an important spawning and nursery area for those fish. The south end of Kocemba Bay begins near the northern boundary of the LWBC property and is about 560 feet north of and around two points from LWBC's proposed beach and boat dock area. Project opponents are concerned that activities at the camp will disturb the spawning area.

A second predominant concern is the potential for degradation of Deer Lake's water quality as a result of phosphorus loading from the project. Deer Lake is an oligotrophic lake, which means that it is low in nutrients including, as pertinent here, phosphorus. Generally speaking, increases in phosphorus levels lead to an increase in algae, decreases in lake transparency and oxygen levels, and reduction of favorable habitat for aquatic organisms. Potential sources of phosphorus inputs to Deer Lake include septic systems, surface-water runoff, and disturbance of the lake bottom. Project opponents are concerned that the construction and operation of the camp will adversely impact phosphorus levels in Deer Lake.

*Procedural history*

After purchasing the property, LWBC sought rezoning to allow for the operation of a camp on the property. *Newton v. Cnty. of Itasca*, No. A05-879, 2006 WL 771719, at *1 (Minn. App. Mar. 28, 2006), *review denied* (Minn. June 20, 2006). The Itasca County Board of Commissioners denied appellant's rezoning application without findings; LWBC sought declaratory judgment in district court, which reversed and remanded the zoning determination; and this court affirmed the district court. *Living Word Bible Camp*

3

*v. Cnty. of Itasca*, No. A03-385, 2003 WL 22890070, at *1 (Minn. App. Dec. 9, 2003). On remand, the board voted to approve the rezoning request, and two neighboring landowners sought declaratory judgment in district court, which reversed the approval as arbitrary and capricious. *Newton*, 2006 WL 771719, at *2. But this court reversed the district court, holding that the county's approval of the rezoning request was not arbitrary or capricious. *Id.* at *5-6.

After the property was rezoned, LWBC sought a conditional-use permit (CUP) and planned-unit-development permit (PUD) to allow construction of the camp facilities. *In re Applications of Living Word Bible Camp*, No. A06-1374, 2008 WL 2245708, at *1 (Minn. App. June 3, 2008). Neighboring landowners submitted a petition requesting preparation of an environmental-assessment worksheet (EAW) pursuant to Minn. Stat. §116D.04, subd. 2a(c) (2012). The county, as the responsible governmental unit (RGU), determined that an EAW was not necessary and granted the CUP and PUD. *Applications of LWBC*, 2008 WL 2245708, at *1. Neighboring landowners sought declaratory judgment from the district court,[1] which determined that an EAW was necessary for the project but nevertheless affirmed the grant of the CUP and PUD. *Id.* at *3. This court affirmed the district court's determination that an EAW was required, reversed the approval of the CUP and PUD as premature, and remanded for further proceedings. *Id.*

---

[1] Before a 2011 legislative amendment providing for direct appeal to this court, environmental-review decisions were subject to challenge through a declaratory judgment action in the district court. *Compare* Minn. Stat. § 116D.04, subd. 10 (2010) *with* Minn. Stat. § 116D.04, subd. 10 (2012); *see also* 2011 Minn. Laws. ch. 4 § 8, at 60.

4

On remand, the county prepared an EAW, took public comments, and issued a positive declaration on the need for an EIS. *Living Word Bible Camp v. Cnty. of Itasca*, No. A12-281, 2012 WL 4052868, at *1 (Minn. App. Sept. 17, 2012), *review denied* (Minn. Nov. 27, 2012). LWBC sought declaratory judgment from the district court that the positive declaration was arbitrary and capricious based on the biased conduct of one county commissioner. *Id.* at *3. The district court granted declaratory judgment reversing the positive declaration and remanding for preparation of a new EAW without the participation of that commissioner. *Id.* at *4. The district court also recommended that the county refer the matter to a different RGU if possible. *Id.* Project opponents appealed; this court affirmed the district court order, and the Minnesota Supreme Court denied review. *Id.* at *1, *9.

### *Proceedings underlying this appeal*

In 2013, after being notified by the Environmental Quality Board (EQB) that it would remain the RGU for the project, the county began the EAW process anew. LWBC submitted a draft EAW, prepared by consultant Westwood Professional Services, to the county on March 18, 2013. The county's environmental-services administrator, Don Dewey, reviewed the EAW, made some edits, and presented it to the county board of commissioners on March 19. Each of the commissioners reviewed the draft EAW, and the board voted to accept the document as accurate and complete on March 21. The EAW was published in the EQB Monitor on April 1, which commenced a 30-day public-comment period.

The county received 55 written comments during the public-comment period. The county also held a public meeting on April 25, at which it received oral comments from five individuals. Of the 55 written comments, four were from the following governmental agencies: the Department of the Army (Army Corps of Engineers), the Minnesota Department of Natural Resources (DNR), the Minnesota Pollution Control Agency (MPCA), and the Itasca County Soil and Water Conservation District (SWCD). None of the agencies took the position that an EIS was required, although both the DNR and the MPCA sought additional information regarding the project.

In connection with preparing responses to the comments received, county officials, including Dewey, exchanged e-mails and met with officials from the DNR, which had offered to assist the county in assessing the need for an EIS in a letter submitted in response to the first EAW completed by the county in 2010. In that 2010 letter, the DNR had expressed its opinion that "[i]n general, more details are necessary to understand if there are potentially significant environment[al] effects from this proposal." The DNR sought more specific information regarding the nature of the project, including the number of people that would be on the grounds at any given time, the anticipated phosphorus loading from surface-water runoff, results of soil and groundwater tests to determine whether past uses of the property posed environmental concerns, delineation of the ordinary high water line (OHWL), and more specific identification of the mitigation measures that could be taken to alleviate potential environmental effects. The DNR concluded that "[t]here is a need to further describe various environmental effects from the project and identify specific mitigation measures that could be included as

requirements of project permitting to minimize negative environmental effects. The DNR would be willing to meet to address any questions you may have."

On April 23, 2013, during the public-comment period, DNR officials met with county staff and LWBC representatives. On April 29, the DNR submitted a public-comment letter. In this 2013 letter, the DNR stated that while some of its concerns had been addressed in the 2013 EAW, others had remained outstanding; that many of those outstanding concerns were answered during the April 23 meeting; that "[a]dequate written responses to all of our comments will ensure they have been sufficiently answered"; and that the DNR was willing to review a draft version of the responses. The DNR noted that the 2013 EAW did not delineate the OHWL; explain whether elevated levels of phosphorus indicated in soil and groundwater tests were normal for the area; identify specific mitigation measures for the protection of the Kocemba Bay area; or indicate a replacement site for the septic drain field. The DNR also clarified some statements made in the EAW and appendices. The DNR concluded:

> The new information provided in the document as well as the information from our meeting on April 23, 2013, is a positive step toward understanding project details and minimizing the overall impacts. Providing documented responses to our concerns will help ensure the issues have been adequately addressed. The DNR is willing to assist you in this task.

As the DNR invited it to do, the county circulated its draft responses to comments by e-mail to DNR officials, who suggested edits to the responses.[2] Ultimately, on

---

[2] In their reply briefs, relators complain that the county did not disclose e-mail correspondence between county staff and DNR representatives until the administrative record was filed with the court after relators' principal briefs were due. But it appears

May 20, the DNR sent a letter indicating that it had reviewed the responses to the comments on the LWBC EAW and that "[o]ur questions regarding this project have been adequately addressed."[3]

The county board met on May 28 to consider whether to issue a positive or negative declaration on the need for an EIS in relation to the LWBC project. Dewey recommended a negative declaration and presented proposed responses to comments, findings of fact, and record of decision for the board's approval. The county commissioners held a discussion on the record during which they expressed their beliefs that the project will not cause significant environmental impacts. At least two of the commissioners relied to some degree on the fact that the government agencies that had commented, including the DNR, had not urged the need for an EIS. The board unanimously voted to issue a negative declaration and to adopt the responses to comments, proposed findings, and record of decision.

This appeal follows.

## D E C I S I O N

The Minnesota Environmental Policy Act (MEPA), Minn. Stat. §§ 116D.01-.11 (2012), "requires that governmental agencies contemplating taking action (e.g., issuing a

that relators had access to these materials in preparing their principal briefs, which include pinpoint cites to the DNR correspondence in the administrative record.

[3] The county, through Westwood, also sought confirmation from the MPCA that the county had adequately addressed the concerns raised in MPCA's public-comment letter. The county did not hear back from the MPCA until May 31, when the MPCA confirmed that the responses "adequately addressed" its comments. Because the county issued the negative declaration on May 28, the MPCA e-mail is not part of the record on appeal.

8

conditional use permit) on a proposed project must first consider the project's environmental consequences." *Citizens Advocating Responsible Dev. v. Kandiyohi Cnty. Bd. of Comm'rs*, 713 N.W.2d 817, 823 (Minn. 2006) ("*CARD*"). MEPA "*primarily* operate[s] by requiring administrative agencies to take a 'hard look' at the environmental consequences of governmental action, without imposing substantive requirements." *Minn. Ctr. for Envtl. Advocacy v. Minn. Pollution Control Agency*, 644 N.W.2d 457, 468 (Minn. 2002) ("*MCEA*") (quotation omitted); *see also No. Power Line, Inc. v. Minn. Envtl. Quality Council*, 262 N.W.2d 312, 327 (Minn. 1977) (stating that purpose of MEPA is "to force agencies to make their own impartial evaluation of environmental considerations before reaching their decisions").

Environmental review in Minnesota is governed not only by MEPA, but also by rules adopted by the EQB. Minn. R. 4410.1000-.3100 (2011). The legislature has conferred broad rulemaking authority on the EQB, requiring it to promulgate rules governing particular procedures and "any additional rules which are reasonably necessary to carry out the requirements of" environmental review under MEPA. Minn. Stat. § 116D.04, subd. 5a (authorizing EQB to adopt rules implementing MEPA). Rules adopted by the EQB pursuant to this statutory authority have "the force and effect of law." Minn. Stat. § 14.38, subd. 1 (2012). In addition to its rules, the EQB has published *EAW Guidelines* to assist RGUs like the county in administering the environmental-review process. *See EAW Guidelines*, http://www.eqb.state.mn.us/documents/EAW%20guidelines%202013%20revision.pdf (2013). Although they do not have the force and effect of law, these guidelines provide

9

useful guidance and are entitled to deference from this court. *See Lemmerman v. ETA Systems, Inc.*, 458 N.W.2d 431, 433 (Minn. App. 1990) ("We will defer to an agency's interpretation of its own statutes unless such interpretation is in conflict with the express purpose of the statutes and the legislature's intent.").

Environmental review under Minnesota law has two possible stages: the EAW and the EIS. Minn. Stat. § 116D.04, subd. 2a. An EAW is "a brief document which is designed to set out the basic facts necessary to determine whether an [EIS] is required for a proposed action." *Id.*, subd. 1a(c). "An EIS is an exhaustive environmental review that the party proposing the project must conduct at its own expense." *CARD*, 713 N.W.2d at 824; *see also* Minn. Stat. § 116D.04, subd. 2a (describing contents of EIS).

In this case, an EAW was compelled by a citizen petition. *See* Minn. Stat. § 116D.04, subd. 2a(c). Citizen petitions for EAWs are submitted to the EQB, which designates an RGU to determine whether an EAW is necessary and, if so, prepare the EAW. *Id.* Once prepared, the RGU publishes notice of completion of an EAW and a 30-day public-comment period commences. *Id.*, subd. 2a(b). Once the public-comment period ends, the RGU is responsible for preparing responses to the comments received, and for determining whether the project has the potential for significant environmental effects. *Id.*; Minn. R. 4410.1700, subps. 1, 4. If the RGU determines that the project has the potential for significant environmental effects, it must issue a "positive declaration" on the need for an EIS. Minn. R. 4410.1700, subps. 1, 3. If the RGU determines that there is not such potential, it will issue a "negative declaration." *Id.* In connection with

10

the EIS determination, "[t]he RGU shall maintain a record, including specific findings of fact, supporting its decision." *Id.*, subp. 4.

A county's decision to issue a negative declaration is reviewed as an agency decision under the standards articulated in the Minnesota Administrative Procedures Act (MAPA), particularly Minn. Stat. § 14.69 (2012). *See CARD*, 713 N.W.2d at 832 (applying agency standards of review to county EIS determination); *MCEA*, 644 N.W.2d at 464 (applying MAPA standards to EIS determination despite lack of contested-case hearing). Under that standard, the county's decision is entitled to substantial deference, and will be disturbed only upon a showing that the decision is arbitrary and capricious, based on an error of law, or not supported by substantial evidence. *CARD*, 713 N.W.2d at 832. "[An appellate court's] role . . . is to determine whether the [county] has taken a hard look at the problems involved, and whether it has genuinely engaged in reasoned decision-making." *Id.* (quotations omitted).

## I.

Relators are neighboring landowners and others who oppose the LWBC project.[4] They argue that because the county committed multiple procedural errors in issuing the negative declaration, reversal is required. They attempt to paint a picture of Dewey, the county's environmental-services administrator, as a biased advocate for LWBC and further suggest that the county improperly influenced the DNR to withdraw its opposition to the project. We have carefully reviewed the record, and find no support for these inflammatory allegations. Dewey's recommendations to the county board based on his

---

[4] Relator Newton has appeared separately from the other relators.

environmental expertise did not show bias but rather the fulfilment of his job functions with the county. And a proper reading of the DNR's correspondence reveals that it never opposed the LWBC project or even asserted that an EIS should be required. Instead, the DNR merely sought additional information, which, once provided, satisfied its concerns about the project. We address the specific procedural arguments raised by relators in the following sections and conclude that the county appropriately conducted the environmental-review process as dictated by MEPA and EQB rules and as contemplated in the *EAW Guidelines*.

A.      *The county did not err by adopting a draft EAW submitted by LWBC.*

Relator Newton asserts legal error in the county's adoption of an EAW prepared by LWBC's consultant. The county responds that "[t]here is no statute, rule, or case which requires an RGU to gather its own independent data, without the assistance of outside consultants or utilizing the expertise of state agencies." We agree. Moreover, as the county also highlights in its brief, the rules specifically provide for the county's receipt of data from the project proposer. *See* Minn. R. 4410.1400. Once it has received and accepted as complete the project proposer's submission, the RGU has 30 days to "add supplementary material to the EAW, *if necessary*, and to approve the EAW for distribution." *Id.* (emphasis added). The *EAW Guidelines* similarly provide that, upon receiving the completed data portions from the project proposer, the "RGU has 30 days to add additional information, revise the text *as necessary* and approve the EAW for public distribution." *EAW Guidelines* at 5 (emphasis added); *cf.* Minn. Stat. § 116D.04, subd. 2a(i) (permitting RGU to accept preliminary draft of EIS from project proposer, "require

12

additional studies, *if needed*" for RGU to "perform its responsibility to review, modify, and determine the completeness and adequacy of the [EIS]" (emphasis added)).

Here, LWBC submitted a draft EAW prepared by its consultant, Westwood. Dewey reviewed the EAW, made edits to it, including drafting a more complete response to one of the questions, and added an additional document to the appendix. Dewey reviewed the EAW for completeness and responsiveness before presenting it to the board. Each of the commissioners also reviewed the EAW and voted to accept it as complete and accurate. We agree with Dewey's statement to the board that its vote "made the EAW the [b]oard's EAW." Accordingly, we reject Newton's assertion that the county erred by using a draft EAW prepared by LWBC's consultant.

> B.    *The county did not err by meeting with the representatives of the DNR and LWBC during the public-comment period.*

Relators assert legal error stemming from the April 23 meeting attended by county staff and representatives of the DNR and LWBC.[5] We discern nothing in MEPA or the EQB rules that precluded the county from seeking assistance from the DNR and LWBC in responding to comments. Moreover, the *EAW Guidelines* specifically contemplate that,

> in certain cases, it may be advisable to send out responses in advance of the decision to solicit comments before the EIS need decision is made. The RGU may ask the proposer to help prepare responses if the comments ask for changes in the project or a commitment to mitigation, or question the purpose or value of the project.

---

[5] At one point in her brief, relator Newton asserts that this meeting took place after the close of the public-comment period, but the record is clear that the meeting was on April 23, before the close of the public-comment period on May 1.

13

*EAW Guidelines* at 2-3.

The Brown relators assert that the April 23 meeting "probably should have been public under Minn. R. 4410.1600." That rule provides for an optional public meeting during the public-comment period:

> The RGU may hold one or more public meetings to gather comments on the EAW if it determines that a meeting is necessary or useful. Reasonable public notice of the meetings shall be given prior to the meetings. All meetings shall be open to the public.

Minn. R. 4410.1600. This section addresses meetings of the RGU, in this case the county, which can act only through its board of commissioners. *See* Minn. Stat. § 373.02 (2012). The April 23 meeting was not a meeting of the RGU, and thus was not subject to Minn. R. 4410.1600. *Cf. Sovereign v. Dunn*, 498 N.W.2d 62, 67-68 (Minn. App. 1993) (holding that meetings of delegation created by city council but not including a quorum of council members and lacking authority to take action on behalf of the council were not meetings of the council subject to the open meeting law), *review denied* (Minn. May 28, 1993); *The Minn. Daily v. Univ. of Minn.*, 432 N.W.2d 189, 192, 194 (Minn. App. 1988) (holding that meetings of advisory committee approved by board of regents, but not including any regents, were not meetings of the board subject to the open meeting law), *review denied* (Minn. Jan. 25, 1989). Accordingly, we reject the assertion that the county erred by meeting with representatives of the DNR and LWBC during the public-comment period.

C. *The county did not err by considering a letter from the DNR received after the close of the public-comment period.*

Relators assert legal error in the county's accepting into the record the May 20, 2013 letter from the DNR, arguing that it was a late "comment" that the county was not authorized to consider under the MEPA or the EQB rules. The county responds that "[r]elators' position has no basis in law or fact" and that "RGUs should be encouraged to reach out to state agencies to address comments." Once again, we agree with the county.

Initially, it is not clear that the May 20 letter is properly treated as a "comment" that was due by the end of the public-comment period. Rather, the letter was part of an ongoing dialogue between the DNR and the county to assist the county in responding to public comments on the EAW. This is precisely the type of information gathering that MEPA is intended to promote. Indeed, the DNR is required under MEPA to "make available to . . . counties . . . information useful in restoring, maintaining, and enhancing the quality of the environment, and in meeting the policies of the state as set forth in [MEPA]." Minn. Stat. § 116D.03, subd. 2(6) (2012). And the EQB has recognized the important role that state agencies may play in drafting responses to public comments, stating that "in certain cases, it may be advisable to send out responses in advance of the decision to solicit comments before the EIS need decision is made." *EAW Guidelines* at 2-3. Even to the extent that the May 20 letter is properly considered a "comment," the *EAW Guidelines* recognize an RGU's discretion to accept and consider late comments. *See id.* at 2 ("Late comments may be responded to if the RGU chooses to do so.")

15

The Brown relators read Minn. Stat. § 116D.04, subd. 2a(b), to require that an RGU limit its consideration, when making an EIS determination, to the EAW and the comments received. The statute provides that the "decision on the need for an environmental impact statement shall be based on the environmental assessment worksheet and the comments received during the comment period." Minn. Stat. § 116D.04, subd. 2a(b). But the EQB rules make clear that "[t]he RGU shall base its decision regarding the need for an EIS on the information gathered during the EAW process and the comments received on the EAW." Minn. R. 4410.1700, subp. 3.

The Brown relators argue that the rule is inconsistent with the statute and thus the statute must control. *See Vang v. Comm'r of Pub. Safety*, 432 N.W.2d 203, 206 (Minn. App. 1988) ("An administrative regulation is valid only to the extent it is consistent with the statutory authority pursuant to which it is promulgated."), *review denied* (Minn. Dec. 30, 1988). We disagree. While Minn. Stat. § 116D.04, subd. 2a(b), requires the RGU to base its EIS decision on the EAW and the comments received during the public-comment period, nothing in the statutory language precludes an RGU from considering additional information gathered before the EIS decision is made. The Brown relators attempt to draw an analogy between the statute and the close of evidence in adversarial legal proceedings. But the environmental-review process is not an adversarial proceeding; rather, the purpose of the proceedings is for the RGU to gather information on the possible environmental impacts of a project. *See MCEA*, 644 N.W.2d at 468 ("[P]reparing an EAW, making the decision whether the EAW requires an EIS, and the ultimate preparation of an EIS are essentially an information gathering and analytical

16

process."). Given this purpose, it makes no sense to construe Minn. Stat. § 116D.04, subd. 2a(b), to limit the RGU's ability to consider additional, relevant information after the close of the public-comment period. *See* Minn. Stat. § 645.17(1) (2012) (stating that the "legislature does not intend a result that is absurd, impossible of execution, or unreasonable").

Notably, this court has declined to construe the language in Minn. Stat. § 116D.04, subd. 2a(b), to limit the record to the EAW and public comments. *Trout Unlimited, Inc. v. Minn. Dep't of Agric.*, 528 N.W.2d 903, 907-08 (Minn. App. 1995), *review denied* (Minn. Apr. 27, 1995). Although *Trout Unlimited* involved an RGU's attempt to limit the record on appeal, this court's reasoning is equally apt here: "If the disputed documents were available and in the possession of the [RGU], they are part of the record as defined by the statute, and should have been considered by the [RGU] when determining whether an EIS was necessary." *Id.* at 908.

In sum, we conclude that the county's acceptance and consideration of the May 20 DNR letter was not inconsistent with the procedure set forth in MEPA and the EQB rules, as further explained in the *EAW Guidelines*. Accordingly, we reject relators' assertion that the county erred by relying on the letter in reaching its decision to issue a negative declaration.

> D.    *The county did not err by failing to reopen the public-comment period after receiving the DNR letter.*

The Brown relators assert that the county erred by not reopening the record pursuant to Minn. R. 4410.1700, subp. 2a, after it considered the DNR's May 20 letter.

17

That rule provides that an RGU with insufficient information to determine the necessity of an EIS shall either make a positive declaration or postpone the decision in order to obtain the information. Minn. R. 4410.1700, subp. 2a. The rule would come into play if an RGU was facing a deadline to make a declaration and did not have enough information. Nothing in the rule, however, precluded the county from gathering the information that it needed and making a decision before the deadline, as it did in this case. Accordingly, we reject relators' assertion that the county erred by failing to reopen the public-comment period after receiving the DNR letter.

E. *Relators' other assertions of procedural error are without merit.*

Relators generally contend that the environmental-review process carried out by the county was not transparent enough and that additional public participation should have been permitted. Our supreme court addressed similar arguments about transparency and public participation in *Moberg v. Indep. Sch. Dist. No. 281*, in which a school board sought and relied upon the school-closing recommendations of a fact-finding panel that met in private. 336 N.W.2d 510, 513 (Minn. 1983). In rejecting appellants' arguments that they were entitled to an additional public hearing following the panel's recommendation, the court explained:

> The Board complied with the statutory requirements by publishing the notice and receiving extensive public testimony at earlier stages. . . . The fact-gathering and deliberation process may continue until the Board feels confident that it is adequately prepared to decide the matter. In this case, the Board, which has wide discretion in such matters, chose to weigh the panel's recommendation heavily in making its decision. It was also capable of discounting any possible errors

18

> contained in the panel's report without submitting it to
> another round of public debate.

*Id.* at 515. The court was careful not to "minimize the significance of public input," but observed that "we look to the locally elected representatives to receive public input, and weigh and resolve such conflicts within the parameters of their statutory authority." *Id.*

In this case, the county's environmental-review process complied with MEPA and the EQB rules. The only public-participation requirement in MEPA is the public-comment period. *See* Minn. Stat. § 116D.04, subd. 2a(b). Even the public meeting that the county chose to hold was optional. *See* Minn. R. 4410.1600. To the extent that relators advocate a more open environmental-review process, their advocacy must be directed to the legislature, not to this court. *See Martinco v. Hastings*, 265 Minn. 490, 497, 122 N.W.2d 631, 638 (1963) ("If there is to be a change in the statute, it must come from the legislature, for the courts cannot supply that which the legislature purposely omits or inadvertently overlooks.").

**II.**

Relators assert that the negative declaration is not supported by substantial evidence. "A decision is supported by substantial evidence when it is supported by (1) such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; (2) more than a scintilla of evidence; (3) more than some evidence; (4) more than any evidence; or (5) the evidence considered in its entirety." *MCEA*, 644 N.W.2d at 464. Having carefully reviewed the record in light of this deferential standard, we

conclude that the county's decision to issue a negative declaration is supported by substantial evidence.

In determining whether a project "has the potential for significant environmental effects," such that a positive declaration on the need for an EIS is required, an RGU must consider four factors: (1) the "type, extent, and reversibility of environmental effects"; (2) the "cumulative potential effects"; (3) "the extent to which the environmental effects are subject to mitigation by ongoing public regulatory authority"; and (4) "the extent to which environmental effects can be anticipated and controlled as a result of other available environmental studies undertaken by public agencies or the project proposer, including other EISs." Minn. R. 4410.1700, subp. 7.

Although it must consider all known potential impacts to the environment, "the county cannot be compelled to prepare an EIS on the basis of speculative factors." *Iron Rangers for Responsible Ridge Action v. Iron Range Res.*, 531 N.W.2d 874, 881 (Minn. App. 1995), *review denied* (Minn. July 28, 1995). "[U]nsupported fears do not require a full-blown investigation." *CARD*, 713 N.W.2d at 833. An EIS determination involves considering "whether the project, *as proposed*, ha[s] the potential for causing significant environmental effects." *Id.* at 835 (emphasis added). And "[w]here there are technical disputes and uncertainties, the court must assume that the agency or RGU has exercised its discretion appropriately." *Iron Rangers*, 531 N.W.2d at 881.

As we noted above, a predominant concern about the LWBC project is the possibility for the disturbance of area wildlife, particularly muskellunge that spawn in Kocemba Bay. The county's determination that the project does not have the potential

20

for significant environmental effects in this regard is supported by the county's correspondence with the DNR and the DNR's comment letters. In its 2010 and April 2013 comment letters, the DNR identified as lacking from the EAW the specific mitigation measures that could be taken to avoid impacting the muskellunge spawning area. After reviewing the county's proposed responses to comments, which included LWBC's commitments to prohibit access to Kocemba Bay, the DNR concluded that its concerns in this regard had been "[a]dequately answered." And in its May 20 letter to the county, the DNR indicated that "[o]ur questions regarding this project have been adequately addressed." The DNR is the state agency charged with "protecting and managing Minnesota's natural resources." *Minn. for Responsible Recreation v. Dep't of Natural Res.*, 651 N.W.2d 533, 536 (Minn. App. 2002); *see also* Minn. Stat. § 97A.045 (2012) (providing commissioner of natural resources with duty and powers to protect desirable species of wild animals). As such, its opinion that the possible impacts to the spawning habitat will be sufficiently mitigated provides substantial evidence to support the county's conclusion that there is not a potential for significant environmental effect in this regard.

A second predominant concern is the possibility of increased phosphorus loading to Deer Lake, from surface-water runoff, wastewater and/or disturbance of the lake bottom. The county's determination that the project does not have the potential for significant environmental effects in this respect is supported by the reports of limnologist Carolyn J. Dindorf and engineer Lanol L. Leichty, as well as the DNR's correspondence and comment letters. In a report attached to the EAW, Dindorf states that Deer Lake

ranked 114 of 179 (one being the most sensitive) for phosphorus sensitivity in a lake sensitivity test conducted by the DNR and MPCA, and that Deer Lake water transparency has improved in recent years. Dindorf concludes that, with the protective measures that LWBC has incorporated into the design or otherwise committed to, "increases in phosphorus and other pollutants from this development and impacts on the lake ecology and quality are expected to be minimal."

With respect to runoff, Dindorf reviewed the LWBC design elements intended to preclude runoff and concluded that "[w]ith the low imperviousness, existing native vegetation, and infiltration and runoff controls proposed by LWBC, the phosphorus input to the lake from site runoff is expected to [be] minimal to none." A hydrological summary prepared by Leichty similarly concludes that "[t]he overall proposed rates of runoff are less than the existing rates for the 2, 10 and 100-year, 24-hour storm events to Deer Lake. . . . As designed, this project will have little if any impact to the surrounding environment from a storm water management standpoint."

With respect to wastewater, Dindorf reports that "[t]he phosphorus that enters the LWBC septic system is expected to be removed by the [system] and surrounding soils." The record also indicates that the system will be overdesigned by about 70% and incorporate advanced treatment technology. With respect to disturbance of the lake bottom, Dindorf opines that "[t]he boat use proposed by LWBC would be a minimal localized impact such as some temporary sediment suspension" and that "[b]oat operation as proposed by LWBC is not expected to increase shoreline erosion." Environmental investigator David G. Holmbeck, a former 37-year employee of the DNR, likewise

concludes that "the 'light on the water activities' proposed by LWBC are not expected to adversely affect Deer Lake's aquatic resource."

Relators assert that the county inappropriately disregarded environmental impacts identified in the comments received on the EAW. The comments received from private individuals primarily identify environmental concerns without taking into account the specific mitigation that is either inherent in LWBC's design of the project or reasonably anticipated through other regulation. Some of the comments are from qualified professionals who criticize the analysis of the reports appended to the EAW. To the extent that there is a conflict of expert opinion, however, it was up to the county to weigh those competing opinions. This court will not reweigh that evidence. *See In re Appeal of Rocheleau*, 686 N.W.2d 882, 891 (Minn. App. 2004) ("The reviewing court is not to retry the facts or make credibility determinations." (quotation omitted)), *review denied* (Minn. Dec. 22, 2004).

The Brown relators also assert that the mitigation measures identified in the responses are no more than "vague statements of good intentions" that cannot be considered as mitigation. "Mitigation" is defined by rule as

A. avoiding impacts altogether by not undertaking a certain project or parts of a project;
B. minimizing impacts by limiting the degree of magnitude of a project;
C. rectifying impacts by repairing, rehabilitating, or restoring the affected environment;
D. reducing or eliminating impacts over time by preservation and maintenance operations during the life of the project;
E. compensating for impacts by replacing or providing substitute resources or environments; or
F. reducing or avoiding impacts by implementation of pollution prevention measures.

Minn. R. 4410.0200, subp. 51 (2011). With respect to mitigation, "[t]he RGU may rely only on mitigation measures that are specific and that can be reasonably expected to effectively mitigate the identified environmental impacts of the project." Minn. R. 4410.1700, subp. 7. "[A]n RGU may not rest its EIS determination decision on mitigation that amounts to only vague statements of good intentions." *CARD*, 713 N.W.2d at 834 (quotations omitted). "The RGU must have some concrete idea of what problems may arise and how they may specifically be addressed by ongoing regulatory authority." *Id.* But our supreme court has recognized "a fundamental distinction between a requirement that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated, on the one hand, and a substantive requirement that a complete mitigation plan be actually formulated and adopted, on the other." *MCEA*, 644 N.W.2d at 468 (quotation omitted).

In this case, the EAW and the responses to comments identify specific limits on project design and operation of the camp that will mitigate the potential environmental effects. LWBC has committed to certain measures regarding both project design and operation of the camp. With respect to design, LWBC has committed to implementing best-management practices for preventing erosion during construction; designing a stormwater management plan that will reduce surface water runoff into Deer Lake compared to current conditions; and oversizing its septic system by 70% and incorporating advanced treatment technologies to ensure proper pretreatment of wastewaters. With respect to operation of the camp, LWBC has committed to instructing staff, patrons, and guests to stay out of Kocemba Bay; limiting the camper swimming

24

area and boat use; and complying with DNR recommendations for limiting excursions in the nearby Balsam-Dear Islands Wildlife Management Area.

Relators assert that LWBC's commitments cannot be considered mitigation because they are voluntary. The Minnesota Supreme Court rejected that argument in *MCEA*, noting that "[w]e are unable to find any requirement in our state's law that the [RGU] cannot consider voluntary measures in assessing mitigation." 644 N.W.2d at 468. And in *CARD*, the Minnesota Supreme Court clarified that environmental measures incorporated into the design of the project are not necessarily "mitigation" but rather merely define the project that the county is to consider in determining whether to require an EIS. 713 N.W.2d at 835. If the proposer failed to incorporate those measures, "the EIS determination would no longer apply and additional environmental review would be necessary." *Id.* Accordingly, LWBC's commitments with respect to both the design and operation of the camp provide substantial evidence to support the county's finding that the camp will not have significant environmental effects.

Beyond LWBC's commitments, the county has identified as potential regulatory limitations the conditions in the 2006 CUP, which included:

- Prohibiting any use of the property beyond that presently planned
- Prohibiting additional structures
- Limiting the maximum number of beds to 150
- Requiring 200-foot setbacks with certain exceptions
- Prohibiting disturbance of trees and vegetation within 75 feet of the ordinary high water line (except at existing beach)
- Requiring a stormwater management plan
- Requiring erosion-control measures
- Limiting visibility of camp buildings and exterior lighting
- Prohibiting entry into Kocemba Bay

25

- Limiting hours of operation

These specific potential conditions support the county's finding that potential environmental effects are subject to mitigation by ongoing public authority. Because the county considered specific mitigation measures and concluded that they would be sufficient, rather than merely deferring any determination on mitigation, this case is distinguishable from *Trout Unlimited*, 528 N.W.2d at 909.

Relators argue that the possible regulatory conditions identified by the county cannot be considered mitigation because they are not presently in place. This assertion misunderstands the inquiry that the county was required to make, which is "the extent to which the environmental effects *are subject to* mitigation by ongoing public regulatory authority." Minn. R. 4410.1700, subp. 7 (emphasis added); *see also* MCEA, 644 N.W.2d at 468 (contrasting consideration of factors, which is required in environmental review, with their implementation, which is not). Thus, the county properly considered what mitigation can be required through future regulatory processes, including the CUP process.

In conclusion, we have carefully reviewed the record and conclude that the county has taken the requisite "hard look" at environmental issues surrounding the LWBC project. The county's environmental-review process was consistent with MEPA and the EQB rules, and the county's decision to issue a negative declaration is supported by substantial evidence. We acknowledge relators' genuinely held concerns for the Deer Lake environment, but "[w]hen, as here, a governing body has followed applicable statutory procedures and its decision is supported by substantial evidence, the courts must

26

uphold that decision though there be heartfelt opposition to it." *Moberg*, 336 N.W.2d at

515-16 (footnote omitted).

**Affirmed.**